**Opinion issued January 31, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00079-CV

———————————

**FAIRWAYS OFFSHORE EXPLORATION, INC., Appellant**

**V.**

**PATTERSON SERVICES, INC. AND CUDD PRESSURE CONTROL, INC.,**
**Appellees**

---

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2007-59388**

---

## MEMORANDUM OPINION

Appellant, Fairways Offshore Exploration, Inc. ("Fairways"), challenges the

trial court's judgment, entered after a jury trial, in favor of appellees, Patterson

Services, Inc. ("Patterson") and Cudd Pressure Control, Inc. ("Cudd"), in Patterson and Cudd's suit against Fairways for negligence and breach of contract. In five issues, Fairways contends that Patterson did not properly plead and submit its claims against Fairways as a property owner for the acts of independent contractors,[1] Patterson did not present the requisite expert testimony regarding the standard of care owed by Fairways to sustain its negligence claim, Cudd and Patterson did not present any evidence of the amounts that Fairways agreed to pay them for their equipment or services, the trial court erred in awarding Patterson damages for both the cost of replacement and the loss of rental income for its destroyed equipment, the evidence conclusively established that Patterson breached an express warranty to Fairways, and the evidence conclusively established that Cudd was negligent and grossly negligent. In a cross-issue, Cudd contends that the trial court erred in granting Fairways' motion to disregard the jury's damages awards for Cudd's cost to repair or replace its equipment under its negligence and breach-of-contract claims.

We affirm in part, reverse and render in part, and reverse and remand in part.

## Background

Fairways was the operator and leaseholder of a natural gas well on the "Federal 1-8" lease located in Wyoming. The well was "sour," meaning that it

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 95.001–.004 (Vernon 2011).

contained a high concentration of hydrogen sulfide, and Fairways sought to complete the well while it was "under pressure." Fairways retained Cudd to provide snubbing services and a snubbing unit, which is a hydraulic workover rig used to push down or pull up on piping or other equipment inside the well. Fairways rented from Patterson a "workstring," which is used, in part, to operate equipment inside the well. The workstring was comprised of used joints of "T95" piping, which is a type of piping specified under the National Association of Corrosion Engineers ("NACE") "standard MR0175" as appropriate for hydrogen sulfide environments. This piping had a represented tensile strength of 171,200 pounds per square inch.

After Cudd had successfully set in the well a packer, which is used to separate different production zones in a well, problems arose with releasing the setting tool from the packer. After some initial attempts to release the setting tool from the packer proved unsuccessful, well operations were shut down for the evening. Fairways decided to "flow the well" during the overnight hours to release pressure in the well. Flowing the well necessarily involved releasing from inside the well a "nitrogen blanket," which was a protective layer of nitrogen that was pumped into the well to displace the hydrogen sulfide to protect surface workers in the event of an emergency and the piping from the corrosive effects of the hydrogen sulfide.

3

The next morning, Cudd, under the direction of Fairways, used its snubbing unit to pull up the well piping in incrementally increasing amounts as part of the continued effort to release the setting tool from the packer. When Cudd pulled the piping at between 128,000 and 130,000 pounds of pressure, the piping parted at "Joint 18," which was located approximately 500 feet below the surface. It is undisputed that the piping broke as a result of sulfide-stress cracking, a process that occurs in hydrogen sulfide environments which causes pipe to become brittle. After Joint 18 parted, the piping then sprung up the well, slamming Cudd's snubbing unit with over 1,000,000 pounds of kinetic force. The snubbing unit had an engineered failure point of 600,000 pounds, and the piping ejected from the well, causing property damage but no personal injuries.

Fairways sued Patterson and Cudd for negligence, breach of contract, breach of warranty, and products liability. Cudd and Patterson generally denied Fairways' allegations and asserted claims against Fairways for breach of contract and negligence.

At trial, the parties presented substantial, conflicting testimony regarding the cause of the sulfide-stress cracking in the piping and the ejection of piping from the well. Fairways presented evidence that Patterson furnished piping that was damaged from prior use, not of the quality represented, susceptible to sulfide-stress cracking, and unsuitable for the sour well. Fairways also presented evidence that

4

Patterson was aware that the piping that it provided was to be exposed to a hydrogen sulfide environment and would not be continuously protected by a nitrogen blanket. For example, Fairways' Vice President of Drilling, Homero Gracia, testified that Fairways needed piping that could "meet certain criteria and withstand the environment" in the well, Patterson was aware of the well's sour environment, no one from Patterson ever stated that a nitrogen blanket was necessary to protect the piping, and Fairways would not have used the piping had it known of any use-restrictions. Gracia asserted that the only purpose for using a nitrogen blanket is to protect "the safety of personnel," and he opined that it was "absurd" to believe that a nitrogen blanket is used to protect equipment and piping.[2] Gracia also testified that the piping provided by Patterson had some "pretty significant" scarring from prior use and was defective because it failed at 75 percent of the represented tensile strength.

Robert Slater, Fairways' metallurgical expert, testified that T95 pipe is specifically tested to withstand a "nasty hydrogen sulfide environment." In reviewing photographs of the failed joint of piping, Slater noted "significant

---

[2]    However, during cross-examination, Gracia provided testimony that the jury could have found to be conflicting on this critical factual dispute at trial. When asked to consider documents pertaining to another well in which Fairways was involved in the completion process, Gracia agreed that, in this other well, a nitrogen blanket and inhibitors had been used to "protect the fishing tools and the coil tubing." However, Gracia qualified this admission by noting that he did not "know the metallurgy of the tubulars" in this other well.

indentations" on the pipe's surface, and he explained that "no tubular with such indentations should have been running to the well given the known downhole conditions." Slater noted that the well's environment would have caused sulfide-stress cracking on non-resistant materials, and he opined that the presence of the indentations on the piping "basically turn[ed] that originally non-vulnerable material into a vulnerable material because of the cold working that occurred as a result of the indentations."

Fairways alleged that Cudd was negligent during its snubbing operations and in using a snubbing unit that failed and allowed the broken pipe to eject from the well. Fairways introduced evidence that Cudd had participated in inspecting Patterson's piping before putting it into the well. H. Gracia testified that the Cudd supervisor at the well, M. Garcia, had rejected a few of the Patterson joints for "deep scarring" from prior jobs. H. Gracia noted that although M. Garcia's job reports, which were introduced into evidence, reflected that he had "concerns for using Patterson equipment" and did not feel 100 percent safe with Patterson pipe, he had not shared these concerns with Fairways. Fairways also introduced evidence that Cudd had not informed Fairways that the snubbing unit had an engineered failure point that permitted certain parts of the unit to fail and, in this case, allowed pipe to eject from the well.

Through their evidence, Cudd and Patterson presented a causation theory that was directly opposed to that presented by Fairways. Cudd and Patterson alleged that the joint on Patterson's workstring had failed as a result of Fairways' critical error in deciding to remove the nitrogen blanket that had been protecting the piping. Although Patterson's expert, Dr. Russell Kane, testified that T95 pipe is appropriate for use in a hydrogen sulfide well, he disagreed with Fairways' contention that T95 pipe will "always work" in such an environment and would not be susceptible to sulfide-stress cracking. He noted that, under the governing industry standards, the user of the pipe, which in this case was Fairways, should have also considered the concentration of the hydrogen sulfide and the "partial pressure" in the well. Kane explained that NACE standard MR01075 provides that approved materials, like T95 piping, are resistant to sulfide-stress cracking "under defined conditions," but are "not necessarily immune to cracking, meaning there is still a possibility that they can fail." He opined that the fact that the joint broke at a level of applied pressure that was below the pipe's rated tensile strength did not establish that the pipe was defective because tensile strength values are "determined in the air," not in hydrogen sulfide environments like that presented in the well. Thus, Kane, through his testimony, indicated that T95 pipe that is not otherwise defective can fail at rates lower than the represented tensile strength ratings depending on the environment surrounding the pipe.

Kane further explained that a well operator like Fairways can avoid sulfide-stress cracking of piping in sour wells by controlling the surrounding environment. As examples of how to control the environment, he explained that an operator could use a chemical "that mitigates the environment" or could "separate the environment from the material." Specifically, Kane noted that an operator could use a nitrogen blanket to reduce or eliminate the concentration of hydrogen sulfide from the areas of a well that have "the greatest susceptibility to cracking." He explained that in determining the areas of piping that are most susceptible to breaking, one would need to consider factors like depth, temperature, and partial pressure. Kane noted that Joint 18, which was located in the top third of the well, was located in the area of the well that was most susceptible to sulfide-stress cracking.

Kane opined that Fairways' decision to remove the nitrogen blanket from the well "let the hydrogen sulfide contact the material and the area which has the very high stresses up high in the hole." Kane further opined that if Fairways had not removed the nitrogen blanket, the pipe would not have parted as a result of sulfide-stress cracking because the nitrogen would have excluded the hydrogen sulfide.

Cudd and Patterson also presented evidence that the T95 pipe, before being used in the Federal 1-8 well, had been inspected and declared to meet American Petroleum Institute ("API") specifications. Fairways' H. Gracia also testified that,

8

after the pipe had ejected from the well, Fairways retained a metallurgist who tested the piping, and this testing revealed that it "met the API."[3] Additionally, there is evidence that when Patterson's piping arrived at the well, it was visually inspected by Fairways' company man, Gary Knape, and Fairways' own snubbing expert, Tannis Contreras, along with Cudd's supervisor, M. Garcia. M. Garcia testified that when the piping arrived at the well, it was marked as premium API inspected piping. He noted that neither Knape nor Contreras had ever expressed any concerns that the piping had excessive scarring. In fact, M. Garcia noted that when he personally decided to "kick out" a few of the joints for "deep gouging," Knape objected and telephoned Bobby Vasquez, a Fairways' superintendent in Houston. Vasquez, instructed M. Garcia to run all of the piping "anyway" because it had been "API inspected." Despite Vasquez's instructions, M. Garcia did not use the "kicked out" joints, which were not necessary. And he stated that he had no concerns about any of the piping that was used in the well.

M. Garcia explained that on the day before the ejection of the pipe from the well, he had successfully set a packer tool in the well, but he noted that there were problems releasing the packer. Knape instructed Garcia to pull up on the piping with 115,000 pounds of pressure, which he did, but the packer still did not release. M. Garcia shut operations down at the well that evening because it was getting

---

[3]    It is undisputed that this metallurgist disposed of the piping after testing.

dark. When Fairways informed him that it had decided to "flow the well" and "evacuate [the] nitrogen blanket," M. Garcia expressed his concern about the hydrogen sulfide "coming to the surface" and affecting the equipment and piping. M. Garcia told Knape that he "didn't like the idea" of flowing the well, and Knape "was well aware of his concern."[4] Nevertheless, Knape told M. Garcia "that's what [Fairways] wants to do, that's what we're going to do." M. Garcia explained that he did not argue with Knape because he "felt comfortable with what we were going to do because our pipe was still, you know, well within its limits to pull what we were going to pull."

The next morning, M. Garcia returned to the well, and Knape told him that Fairways intended to "pull up" on the piping using up to 144,000 pounds of pressure, in increasing increments of 2,000 pounds of pressure. Knape also told M. Garcia that "the engineers ran the numbers and everything is going to be just fine." M. Garcia began pulling and, when he pulled using between 128,000 and 130,000 pounds of pressure, the piping parted at Joint 18.

M. Garcia explained that Cudd's snubbing unit had operated properly and no one from Fairways had told him that they had a reasonable expectation that the pipe might part or break during the operation. However, Fairways' H. Gracia

---

[4] Mickey Hans, Patterson's corporate representative, also testified that the purpose of the nitrogen blanket was to protect downhole equipment and personnel at the surface.

10

admitted during cross-examination that Fairways had a concern that the pipe "could possibly separate" as a result of pulling up on it. M. Garcia also noted that Fairways' own completion procedures had a provision "requiring a nitrogen pad" and the pad was to be "applied to the well bore before any tubing was run into the well" and was to be there before Cudd "started the hole." And he noted that Fairways' completion procedures did not allow for the nitrogen blanket "to be taken off of the well while Cudd was running equipment in the well."

After hearing the evidence, the jury found that

(i)     Fairways' negligence proximately caused the ejection of the pipe from the well[5] and caused Cudd damages in the amount of $77,895.96 for its "cost of repairs or replacement" to the snubbing unit and Patterson damages in the amount of $47,424.80 for cost of repairs to its equipment and $375,426.30 for cost of replacement for its equipment;

(ii)    Patterson's breach, if any, of an implied or express warranty was not a producing cause of the ejection of the piping from the well and Cudd's breach, if any, of an express warranty was not a producing cause of the ejection of the pipe from the well;[6]

(iii)   Fairways failed to comply with its agreement to pay Cudd for snubbing services, and it awarded Cudd damages in the amount of $198,079.28 as the difference between the amount Fairways agreed to pay Cudd and the amount it had paid;

---

[5]     The jury found that neither Cudd's nor Patterson's negligence, if any, proximately caused the pipe to eject from the well. Because the jury found no negligence (and no strict liability) against Cudd, it did not reach the gross-negligence question.

[6]     The jury also found that there was no marketing defect in Cudd's snubbing unit. This finding is not challenged on appeal.

11

(iv)     Fairways failed to comply with its agreement to pay Cudd for its damaged equipment, and it awarded Cudd damages in the amount of $77,895.96 for its "cost of repairs or replacement"; and

(v)      Fairways failed to comply with its agreement to pay Patterson rent for piping and other materials, and it awarded Patterson damages in the amount of $663,691.43 for both the difference between the amount paid by Fairways to Patterson as rent and the amount Fairways agreed to pay and the "reasonable and necessary expenses incurred in attempting to salvage the damaged workstring."

The jury also awarded Patterson and Cudd attorney's fees on their breach-of-contract claims.

Fairways filed a motion for judgment notwithstanding the verdict, which the trial court granted in part. It concluded that Cudd could not recover $77,895.96 for its "cost of repairs or replacement" to the snubbing unit under either its negligence claim, because Cudd did not submit its negligence theory of liability against Fairways under chapter 95 of the Texas Civil Practices and Remedies Code,[7] or its breach-of-contract claim, because there is no evidence that Fairways had an agreement to pay for Cudd's damaged equipment. The trial court also concluded that Patterson could not recover both $47,424.80 for the cost of repairs to its equipment and $375,426.30 for the cost of replacement for its equipment under its negligence claim. And the trial court noted that Patterson elected to recover $375,426.30 for the replacement cost. Additionally, the trial court, in accordance

---

[7]     *See* TEX CIV. PRAC. AND REM. CODE ANN. § 95.003.

with Patterson's voluntary remittitur, reduced the jury's $663,691.43 damage award to Patterson to $521,427.05 in order "to conform to the evidence of outstanding rental charges."

In sum, in its final judgment, the trial court ordered that Fairways take nothing on its negligence and warranty claims against Cudd and Patterson, awarded Cudd breach-of-contract damages of $198,079.28 plus attorney's fees, awarded Patterson negligence damages of $375,426.30, and awarded Patterson breach-of-contract damages of $521,427.05 plus attorney's fees.

## Expert Testimony on Standard of Care

Within a portion of its first issue, Fairways argues that the trial court erred in awarding damages to Patterson on its negligence claim because Patterson did not present the requisite expert testimony on the relevant standard of care. Fairways argues that "[s]ince completion procedures for sour gas wells are beyond the realm of experience and common knowledge of the layperson, Patterson was required to offer expert testimony that Fairways failed to exercise the reasonable care that a reasonably prudent sour gas well operator would have exercised under the same or similar circumstances."

Expert testimony is necessary to establish the applicable standard of care when the alleged negligence is of such a nature as not to be within the experience of laypersons. *FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 90–91 (Tex.

13

2004); *Simmons v. Briggs Equip. Trust*, 221 S.W.3d 109, 114 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also Discovery Operating, Inc. v. BP Am. Prod. Co.*, 311 S.W.3d 140, 169 (Tex. App.—Eastland 2010, pet. denied) (stating that plaintiff was required to present expert testimony on standard of care for operation of injection wells, which "is not within the experience of a layman"). "In determining whether expert testimony is necessary to establish negligence, Texas courts have considered whether the conduct at issue involves the use of specialized equipment and techniques unfamiliar to the ordinary person." *FFE Transp. Servs., Inc.*, 154 S.W.3d at 91. We review whether expert testimony is necessary to prove a negligence claim under a de novo standard. *Id.* at 90.

Here, that the proper operation of a sour gas well is not a matter within the experience of laypersons. Specifically, whether or not the use of a nitrogen blanket in a well, such as the one in this case, was necessary to protect the well piping and equipment, would be unfamiliar to the ordinary person. Thus, in order for the jury to find Fairways liable on Patterson's claim for negligence, Patterson would have had to present expert testimony on the applicable standard of care and that Fairways violated the standard when it removed the nitrogen blanket.

In arguing that Patterson did not present any expert testimony on the applicable standard of care, Fairways focuses on the following exchange that occurred during the testimony of R. Kane, Patterson's expert witness:

14

[Patterson's counsel]:    What did NACE standard MR0175 govern?

[Kane]:    It governs the selection of materials that go into wells that are described or defined as sour, and those are above the threshold for cracking that we just talked about.

[Patterson's counsel]:    Now, is MR0175 a standard that is used in the oil industry here in the United States?

[Kane]:    Yes.

[Patterson's counsel]:    All right. And under MR0175 does it assign responsibility for who is supposed to select and determine what are the appropriate materials to go into an H2S well?

[Kane]:    Yes. It defines the user as the one that does that.

[Patterson's counsel]:    And does it -- in the standard in the industry is the user also supposed to define the procedures to avoid sulfide-stress cracking?

[Fairways' counsel]    Objection, Your Honor. I really don't have any problem with the witness testifying as to the document, but he has not been designated as an operator expert and he specifically testified in his deposition that he was not going to give any opinions as to that topic. So I object on that basis.

[Patterson's counsel]:    Then I'll withdraw it, Judge.

[Trial court]:    Okay.

With this passage, Fairways contends that Patterson "failed to elicit testimony regarding [its] duty of care."

15

Immediately following the above exchange, Patterson's counsel asked Kane a series of questions about industry standards and the NACE standard. Kane, in reviewing the NACE standard, explained that a user, like Fairways, must take into account "several different things" in determining appropriate materials for a hydrogen sulfide environment, including the "intended use" of the materials and other "properties known" affecting the susceptibility of metallic materials to sulfide-stress cracking. For example, Kane testified that a user, like Fairways, should consider a well's hydrogen sulfide "partial pressure," and he noted that, in the documents that he had reviewed, he saw no indication that Fairways had ever calculated the well's partial pressure or provided information pertaining to partial pressure to any other parties. Kane also stated that, to his knowledge, Fairways had never made calculations regarding the "[p]resence of elemental sulfur or oxidants, temperature, galvanic affects, mechanical stress, [or] exposure time." Other evidence confirmed that Fairways had not taken these factors into consideration. In fact, Fairways' primary trial contention was that T95 pipe was suitable for all hydrogen sulfide environments, including the environmental conditions in the well.

Kane acknowledged that, as provided by the NACE standard, T95 is appropriate for use in hydrogen sulfide wells and the NACE standard defines it as "appropriate for any temperature." But, his testimony indicated that, in his

16

opinion, a user like Fairways errs in presuming that this language warrants performance of T95 piping in all hydrogen sulfide environments, regardless of other considerations. Kane explained that, for steels, NACE does not specifically assign pipe based on pressure or concentration in the well. He disputed Fairways' contention that T95 pipe will always work in a hydrogen sulfide environment, noting that even the NACE document contained a warning regarding the selection of materials in hydrogen sulfide environments. Kane stated that the NACE document described "industry best practice" and set forth materials "condoned as resistant to cracking under defined conditions," but there was no guarantee. Although Kane offered direct testimony that a user, like Fairways, must take into account a variety of factors in selecting well-appropriate materials and Fairways did not do this, this constitutes no evidence that the standard of care required that Fairways leave a nitrogen blanket in place to protect well piping and equipment or that Fairways breached the standard of care by removing the nitrogen blanket.

Kane also offered testimony concerning the high-level, extremely sour, hydrogen sulfide conditions in the well. And he provided testimony that under these conditions in the well, the T95 pipe could have failed under pressures lower than the rated tensile strength, the operator or user (in this case, Fairways) could have prevented failure by controlling the well's environment, one of the ways to prevent the failure was the use of a nitrogen blanket around areas most susceptible

to cracking, and the piping would not have broken if the nitrogen blanket had not been removed. Again, however, Kane did not testify that the appropriate standard of care required the constant use of a nitrogen blanket.

In addition to Kane's testimony, M. Garcia also provided testimony concerning the purposes of the nitrogen blanket and his disagreement with Fairways' decision to remove it. H. Gracia also provided somewhat conflicting testimony concerning the general purposes of a nitrogen blanket. He further agreed that Fairways was the "user of the equipment" for purposes of the NACE standard and, to his knowledge, no one at Fairways had ever calculated the well's partial pressure. Even so, the additional testimony does not constitute expert testimony about the applicable standard of care.

In sum, Patterson did not present to the jury expert testimony on the applicable standard of care required of Fairways or that it breached any such standard. Accordingly, we hold that Patterson provided no evidence that Fairways failed to exercise the reasonable care that a reasonably prudent well operator would have exercised under the same or similar circumstances.

We sustain the portion of Fairways' first issue pertaining to expert testimony. Having sustained this portion of Fairways' first issue, we need not address the portion of its first issue in which it argues that Patterson failed to plead, prove, or submit liability under Chapter 95, or its third issue in which it argues that

18

the trial court erred in awarding Patterson damages for replacement cost and loss of rental income for the total loss of Patterson's pipe.

## Damages

In its second issue, Fairways argues that the trial court erred in awarding Cudd and Patterson damages and attorney's fees on their breach-of-contract claims because they did not present any evidence that Fairways had "agreed to pay any particular amount" for their equipment or services. Within this issue, Fairways asserts that the invoices submitted by Cudd and Patterson constitute no evidence of any agreement "to pay a particular amount," there is no evidence "of a term of duration" for the agreements, the invoices are "merely conclusory statements" of amounts claimed but do not reflect an agreement, there is no evidence to calculate an amount owed to Cudd for snubbing services or to Patterson for rental charges, Patterson was not entitled to cure "its evidentiary defects through remittitur," and the statute of frauds bars Cudd and Patterson's contract claims.[8]

### *Patterson's Breach-of-Contract Damages*

The jury found that Fairways failed to comply with its "agreement to pay rent for tubing and other materials rented from Patterson" at the well, and it awarded Patterson damages in the amount of $663,691.43 for the difference

---

[8] Fairways also asserts that Cudd and Patterson's "failure to plead the proper cause of action of [quantum meruit] is fatal to its recovery of contract-type damages." Our holdings that Cudd and Patterson presented sufficient evidence to support their breach-of-contact claims disposes of this argument.

19

between the amount Fairways agreed to pay for rent and the amount it actually paid and the "reasonable and necessary expenses incurred in attempting to salvage the damaged workstring." In accordance with a voluntarily remittitur, the trial court awarded Patterson $521,427.05 "for the amounts owed for the rental of Patterson's tubing and equipment."

The evidence at trial established that Fairways entered into an agreement with Patterson to rent equipment, and Fairways did not pay Patterson amounts that it had agreed to pay as rent based upon its assertion that Patterson had supplied defective or unsuitable equipment. Fairways' Vice President H. Gracia testified that Fairways accepted Patterson's bid to provide it with 530 pieces of pipe. This bid, which was introduced into evidence, reflected a footage amount and a daily price rate of $3,148. H. Gracia further agreed that Fairways had "agree[d] to pay Patterson that price." Thus, H. Gracia did not dispute that the parties had reached an agreement for the rental of equipment, and he further admitted that Fairways had not paid outstanding amounts.

Mickey Hans, Patterson's corporate representative, testified generally that the charges submitted by Patterson in invoices provided to Fairways reflected the equipment and services it provided. Hans explained that there were invoices for

blow out preventers and tubing,[9] and he stated that the amounts charged were usual and customary and reflected the equipment actually provided for the periods of time reflected in the invoices. He also explained that Fairways had not "paid for anything from Fairways."

However, Hans did not offer any detailed testimony concerning the amounts set forth in the invoices, explain how these amounts related to the bid that H. Gracia agreed that Fairways had accepted, explain how the number of days and the rental periods for the various pieces of equipment were calculated, or distinguish between the various itemized costs for rental charges, inspection charges, sale item charges, waste disposal charges, and other miscellaneous charges. Hans also did not address whether, or explain why, rental fees were charged for periods that dated well after the pipe had ejected from the well—the end of November 2006. In fact, Hans never testified to an amount that would fairly represent Patterson's damages. Instead, he simply referred to the invoices without any significant explanation as to what they represented. In sum, the testimony provided by Hans, Patterson's only witness, was short on details.

---

[9] He also explained that there were invoices for charges related to attempts to repair the tubing once it was "retrieved from the well and brought back to Patterson" and charges related to the replacement of the piping. The terms of the trial court suggest that it only awarded rental amounts.

21

On appeal, Patterson has attempted to provide a clearer explanation of its exact damages. It explains that, after trial, it voluntarily remitted a portion of the $663,691.43 jury award because the jury question "referred only to rents for the lost workstring—not inspection costs or shipping costs," which Patterson contends were also identified in the invoices considered, without any explanation, by the jury. Patterson further explains that it segregated out from those invoices only those amounts that relate to rental charges, which complies with the jury charge, and it asserts that the $521,427.05 ultimately awarded by the trial court "appeared clearly, unambiguously, and unmistakably in the record" in six invoices. In its appellate brief, Patterson, citing these six invoices, sets forth a list of total amounts from each invoice and then compiles those totals to reach the amount awarded by the trial court.[10]

First, we note that one of the invoices that Patterson asserts "unmistakably" sets forth a balance of $118,995.06 of outstanding rental charges is incomplete and is missing pages. This amount appears nowhere in the invoice in the record before us. Second, while the other five invoices do contain rental charges for the amounts identified by Patterson (in its appellate brief), there was very little evidence presented in the trial court addressing the terms of the invoices, the amounts charged, the billing periods, and the identified equipment. Patterson, on appeal,

---

[10] Such a list was not included in the reporter's record.

has also made no effort to explain the terms of these invoices or point to record evidence offering any explanation for the terms.[11] Third, Patterson did not provide any evidence explaining the billing periods for the rental of the equipment. There is no explanation as to why equipment rental was charged for all pieces of the workstring after the occurrence, since the evidence demonstrated that at least some of those pieces were damaged or destroyed.[12]

In sum, Fairways admitted that it accepted Patterson's bid, which set forth a daily rate. The evidence established that Patterson equipment was delivered and

---

[11] The first invoice, which appears incomplete and for which Patterson claims outstanding rental fees of $118,955.06, refers to 11 pieces of equipment, including blow out preventers, a billing period of November 11, 2006 to November 29, 2006, and daily rates for the equipment; the second invoice for which Patterson claims outstanding rental fees of $59,815.80 refers to two entries for workstring—one for 483 pieces and another for 47 pieces, a billing period of November 11, 2006 to November 29, 2006, and applicable daily rates; the third invoice for which Patterson claims outstanding rental fees of $11,565.17 refers to various pieces of equipment, a billing period of December 5, 2006 to January 4, 2007, and applicable daily rates; the fourth invoice for which Patterson claims outstanding rental fees of $304,116.12 refers to 483 pieces of workstring, a billing period of November 30, 2006 to March 15, 2007, and applicable daily rates; the fifth invoice for which Patterson claims outstanding rental fees of $10,072.89 refers to various pieces of equipment, a billing period of January 5, 2007 to January 31, 2007, and applicable daily rates; and the sixth invoice for which Patterson claims outstanding rental fees of $16,902.01 refers to various pieces of equipment, a billing period of February 1, 2007 to March 15, 2007, and applicable daily rates. Again, it bears emphasizing that Patterson has not cited a single piece of testimony from any witness to explain the detailed invoices.

[12] However, we reject Fairways' argument that Patterson's contract claim must fail because there is no specified duration. The evidence demonstrated, and Fairways' witnesses admitted, that it rented the equipment on a daily basis and not for a specific duration. A contract charging a fee for daily equipment rental does not fail for lack of duration.

23

used at the well. Patterson presented testimony that it had not been paid for its equipment. We hold that Patterson presented legally-sufficient evidence that Fairways failed to pay Patterson agreed amounts for rented equipment. We further hold that Patterson presented some evidence to support an award of damages for outstanding rental amounts. But the evidence presented in the trial court does not support the amount awarded. "[W]hen there is some evidence of damages, but not enough to support the full amount, it is inappropriate to render judgment." *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. and Research Corp.*, 299 S.W.3d 106, 124 (Tex. 2009); *see also ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 877–78, 880 (Tex. 2010) (explaining that there was legally insufficient evidence to support amount of lost profit damages awarded by trial court but that there was "legally sufficient evidence to prove a lesser, ascertainable amount of lost profits with reasonable certainty," and remanding case to court of appeals for suggestion of remittitur); *Guevara v. Ferrer*, 247 S.W.3d 662, 669–70 (Tex. 2007). In circumstances like these, when there is sufficient evidence to support the award of some damages, but the evidence is insufficient to support the amount awarded, we may suggest a remittitur or remand the case to the trial court for a new trial. *Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 299 S.W.3d at 124; *see* TEX. R. APP. P. 46.3, 46.5 (providing procedures for remittitur by courts of appeals).

24

Here, the evidence does not seem "conducive" to remittitur. *ERI Consulting Engineers, Inc.*, 318 S.W.3d at 880. Although there is evidence demonstrating that Fairways has not paid Patterson for its equipment rentals and Patterson presented evidence that the invoices include (but are not limited to) Patterson's charges for equipment rentals, there is no reasoned basis on which we could suggest a remitted amount or segregate an amount that could be properly awarded. One possibility that we have considered would be simply to suggest an award to Patterson of outstanding amounts owed for equipment rental up until the time of the occurrence. Using this rationale, we would isolate the rental charges that are reflected in the invoices pre-occurrence and would suggest a remittitur of Patterson's breach-of-contract damages from $521,427.05 to $85,404.95 (in part because the incomplete copy of exhibit 1 does not reflect the amounts that Patterson contends). But, after further analysis, this rationale is unsound. The invoices themselves do not set forth the agreed charges, and there was no testimony explaining how the bid, which H. Gracia agrees Fairways accepted, comports with the invoiced amounts. Another rationale would be to simply use the figures in the bid to which Gracia agreed and calculate rentals up until the time of the occurrence. But, the record is not clear as to which pieces of equipment were rented on which days and for what periods of time Patterson should recover rent.[13] There is no way for us to make a reasonable

_____

[13] In a separate portion of its brief, Patterson states that "damages related to the

determination as to the amount of rentals that Patterson is entitled to recover on its breach-of-contract claim against Fairways. Accordingly, we remand this portion of the case for a new trial.[14]

We sustain the portion of Fairways' second issue pertaining to Patterson.[15]

### Cudd's Breach-of-Contract Damages

The jury found that Fairways failed to comply with its agreement to pay Cudd for snubbing services and awarded Cudd $198,079.28 for the difference between the amount Fairways agreed to pay Cudd and the amount it paid.

Cudd introduced into evidence a copy of its October 25, 2006 bid, setting forth estimated daily charges for snubbing services and requiring payment of its

---

rental of the pipe ended when the pipe was pulled from the well and shipped back to Patterson." There is no record reference to support this assertion.

[14] Fairways also contends that Patterson's breach-of-contract claim is barred by the statute of frauds. *See* TEX. BUS. & COMM. CODE ANN. § 2.201 (Vernon 2009) (statute of frauds for sale of goods for the price of $500 or more); *id*. § 2A.201 (Vernon 2009) (statute of frauds for lease of goods). However, Fairways agreed it accepted Patterson's bid and that it rented equipment from Patterson. *Id*. § 2A.201(d)(3) (providing that lease contract that does not satisfy subsection (a) of statute but is valid in other respects is enforceable with respect to goods that have been received and accepted by the lessee). Fairways also sued Patterson for breach of the same contract. *Id*. § 2A.201(d)(2) (providing that lease contract that does not satisfy subsection (a) of statute but is valid in other respects is enforceable "if the party against whom enforcement is sought admits in that party's pleading, testimony or otherwise in court that a lease contract was made").

[15] Because we are remanding for a new trial Patterson's breach-of-contract claims against Fairways, we also reverse and remand Patterson's attorney's fees award, based upon this breach-of-contract claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 2008).

26

charges within 30 days. H. Gracia testified that Fairways accepted Cudd's bid. Gary Knape, Fairways' on site company man, agreed that it was customary in the industry for contractors to provide him with daily invoices for services provided, he had authority to sign daily tickets submitted by contractors, and Cudd employees presented him with daily tickets or invoices. Knape also agreed that his signature appeared on the tickets. He specifically recollected signing the first ticket for Cudd's M. Garcia. Although Knape expressed concern as to how his signature appeared in the same way on each ticket, after further reflection, he agreed that, as best he could remember, his signature was saved electronically. He also stated that he had a general agreement with Cudd wherein he did not sign tickets every day, but he confirmed that he saw Cudd's tickets "every day" and he did not have any "problems" with Cudd's tickets.

Cudd introduced into evidence copies of its invoices for its snubbing services. One of these invoices reflected an outstanding amount owed by Fairways for snubbing services for $198,079.28, and it showed that this reflected a total remaining amount that was over 90 days past due. This invoice also itemized each of the outstanding invoices with the amounts due under the individual invoices. The invoices introduced by Cudd reflect the date worked, the hours worked, and the specific services provided, and Cudd presented evidence that these invoices contained a term requiring payment of invoiced amounts within 30 days.

27

Additionally, Cudd introduced into evidence its daily job reports, which further set out the snubbing services it provided.

In addition to the substantial documentary evidence, Cudd also presented significant testimonial evidence regarding its damages. H. Gracia agreed that Fairways had already paid Cudd $500,000 on the job, and he admitted that there were outstanding amounts, but that Fairways was not paying the outstanding amounts based upon its contention that Cudd was negligent. Eddie Goodman, a Cudd employee, testified that the invoices represented the reasonable and customary charges for snubbing services performed at the well, Fairways had paid a portion of Cudd's bills, and Fairways still owed Cudd $198,079.28. Cudd's M. Garcia also testified regarding the tickets signed by Knape. Garcia stated that these were given to Knape every day and reflected the services that Cudd provided on a daily basis. Fairways did not offer controverting evidence or any evidence indicating that it owed a lesser amount.[16] We hold that Cudd presented legally-

---

[16] As with Patterson, Fairways also contends that Cudd's breach-of-contract claim is barred by the statute of frauds. *See* TEX. BUS. & COMM. CODE ANN. § 2.201 (statute of frauds for sale of goods for the price of $500 or more); *id*. § 2A.201 (statute of frauds for lease of goods). However, the essence of the agreement concerned Fairways' provision of snubbing services. *East Hill Marine, Inc. v. Rinker Boat Co., Inc.*, 229 S.W.3d 813, 818 (Tex. App.—Fort Worth 2007, pet. denied) ("Where a contract contains a mixture of sales and services, section 2.201 applies if the sale of goods is the 'dominant factor' or 'essence' of the transaction."). Thus, the statute of frauds does not apply. Also, Fairways' representatives signed the daily service orders and invoices that detail the snubbing services provided by Cudd, Fairways agreed that it accepted Cudd's bid

and factually-sufficient evidence to support the jury's award of $198,079.28 for the difference between the amount Fairways agreed to pay Cudd and the amount it paid.[17]

We overrule the portion of Fairways' second issue pertaining to Cudd.

## Patterson's Breach of Warranty

In its fourth issue, Fairways argues that the trial court erred in entering judgment in favor of Patterson and not in its favor on its claim for breach of warranty because the evidence conclusively established that Patterson breached an express warranty to Fairways. Fairways asserts that Patterson "made clear representations to Fairways about the technical specification and performance capabilities of its pipe," Patterson represented that it would supply T95 tubing that was "suitable for a sour well" and "could withstand at least 171,200 pounds of pulling force before breaking," and Patterson's pipe failed "substantially below its represented tensile strength." Alternatively, Fairways asserts that the jury's finding on its breach-of-warranty claim against Patterson was contrary to the overwhelming weight and preponderance of the evidence.

---

for snubbing services and signed the daily tickets, and Fairways itself sued Cudd for breach of the same contract. *Id*. § 2A.201(d)(2)–(3).

[17] Fairways' challenge to the award of Cudd's attorney's fees was made solely on the basis that Cudd presented no evidence of damages. Based upon our holding that Cudd presented sufficient evidence of its contract damages, we reject Fairways' challenge to Cudd's attorney's fees award.

A party who attacks the legal sufficiency of an adverse finding on an issue on which that party has the burden of proof must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). We indulge every reasonable inference to support the finding, crediting favorable evidence if a reasonable jury could and disregarding contrary evidence unless a reasonable jury could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 822 (Tex. 2005).

When a party is challenging the factual sufficiency of a finding on an issue upon which that party had the burden of proof, that party must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co.*, 46 S.W.3d at 242. We must consider and weigh all of the evidence and set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id*. The jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

The jury was asked whether the failure, if any, of Patterson to comply with an express warranty was a producing cause of the occurrence. The jury answered "No." The jury was instructed that an express warranty was any "affirmation of fact, promise or description made by Patterson that relates to materials Patterson

30

supplied to Fairways" at the well. In support of its matter-of-law argument, Fairways cites evidence demonstrating that Patterson recommended the piping for the well's sour environment, no one at Patterson expressed any limitations or restrictions on using the piping, and Patterson made representations regarding the piping's tensile strength. H. Gracia testified that Fairways relied on Patterson's expertise because they "rent[] a lot of tubulars in different" and "all types of wells." However, Fairways does not acknowledge the conflicting evidence presented by Patterson.

Patterson presented evidence that the rated tensile strength of the piping was based upon testing in normal air and not in environments like those presented in the well. The evidence on this matter was hotly contested, but Patterson presented evidence that it was Fairways' responsibility to consider certain factors in the well environment in determining if the T95 pipe was suitable for the well. Patterson's expert explained that the use of T95 pipe did not guarantee against sulfide-stress cracking like that experienced by Patterson's piping and that T95 pipe can fail in hydrogen sulfide environments like that presented in the well. Patterson also presented evidence that its piping met API standards and post-occurrence testing on the piping confirmed that the piping's tensile strength fulfilled the representations. In sum, the parties presented the jury with conflicting evidence on the scope of the representations made by Patterson in regard to the piping and

31

the suitability of the piping for all environments. Accordingly, we hold that Fairways did not conclusively establish that Patterson breached an express warranty or that any such breach was a producing cause of the occurrence. We further hold that the jury's finding on the breach-of-express-warranty question was not against the great weight and preponderance of the evidence.

We overrule Fairways' fourth issue.

## Cudd's Negligence

In its fifth issue, Fairways argues that the trial court erred in not entering judgment in its favor on its negligence claims against Cudd because the evidence conclusively established that Cudd was negligent and grossly negligent. Fairways asserts that the evidence conclusively established that Cudd breached its duty to use ordinary care by deciding "to use unsuitable pipe" and failing to ensure that its "snubbing unit could withstand the sudden ejection of pipe from the well." In regard to gross negligence, Fairways contends that Cudd was aware of the substantial risk of death or serious bodily injury in the event the snubbing unit failed. Fairways further contends that, despite the awareness of the risk, Cudd furnished an unsuitable snubbing unit, never verified the "dynamic force" the snubbing unit could withstand, used Patterson pipe over which it had safety concerns, and failed to advise Fairways of these concerns. Alternatively, Fairways

32

contends that the jury's findings on its negligence claim against Cudd were contrary to the overwhelming weight and preponderance of the evidence.

As noted above, a party attacking the legal sufficiency of an adverse finding on an issue on which that party has the burden of proof must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co.*, 46 S.W.3d at 241. A party challenging the factual sufficiency of a finding on an issue upon which that party had the burden of proof must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *Id.* at 242.

The jury was asked to determine whether the negligence, if any, of Cudd, Patterson, or Fairways proximately caused the occurrence. The jury found that only the negligence of Fairways caused the occurrence. The jury did not reach the gross-negligence question. Although Fairways presented evidence that would have permitted the jury to find that Cudd was negligent and that Cudd's negligence caused the occurrence, it did not conclusively establish this matter. All parties in the trial court presented substantial, conflicting evidence concerning which party's negligence caused the occurrence. Although there was some evidence that Cudd had general concerns over using Patterson pipe, Cudd's M. Garcia also testified that he had no concerns over any of the pipe that he placed in the well. Moreover, Cudd presented evidence that the piping arrived at the well after having been

33

inspected and confirmed to meet industry standards, and Garcia explained that none of the Fairways employees on site expressed concerns over any excessive tool marks or the condition of the piping after a visual inspection.

Garcia also stated that the Cudd snubbing unit worked properly and the Cudd crew performed their tasks adequately. Additionally, although there is evidence that Cudd's snubbing unit did not withstand the kinetic force generated by the piping after the break, Cudd presented evidence that the snubbing unit was designed with a failure point as a safety feature, and this safety feature avoided a much more serious incident. Cudd also presented evidence that it would not have been possible to make calculations on the potential force generated by the parting of pipe in the circumstances in which it ultimately parted. Cudd's engineer, E. Goodman, explained that he has never been asked about "design limitations" of a snubbing unit in his thirty-five years in the business and Fairways never indicated that it required a snubbing unit with specific design limitations so as to contain piping in the event of a failure. Goodman explained that the snubbing unit "worked exactly as it was designed to do."

It was undisputed that the piping parted as a result of sulfide-stress cracking. Cudd presented evidence that a nitrogen blanket could have been used to protect equipment from sulfide-stress cracking and a continuous nitrogen blanket would have prevented the occurrence. And Cudd presented testimony that the well had

34

over 12,000 times more hydrogen sulfide than the minimum threshold for sulfide-stress cracking and the nitrogen blanket was removed from the piping, for the first time, during the overnight hours on the night before the occurrence. Gary Knape agreed that, to the best of his knowledge, Cudd had indicated that a nitrogen blanket needed to be maintained throughout the snubbing operations. When M. Garcia learned about Fairways' intent to remove the nitrogen blanket on the night before the occurrence, he expressed concerns to Fairways about what this "could do to our equipment and our tubing," but he was told that this was Fairways' decision.

Although Fairways presented evidence that the purpose of having a nitrogen blanket is only to protect personnel working on the surface and its decision to remove the nitrogen blanket did not cause the piping to eject from the well, Cudd presented evidence demonstrating the opposite. Cudd also presented evidence that would have allowed the jury to find that Fairways had not adequately considered the well's environment before deciding to remove the nitrogen blanket.

In sum, Fairways did not conclusively establish that Cudd was negligent or grossly negligent. Nor are the jury's findings against Fairways on its negligence claims against Cudd against the great weight and preponderance of the evidence. Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's findings against Fairways on its negligence claims against Cudd.

We overrule Fairways' fifth issue.

## Cudd's Cross-Issue

In its cross issue, Cudd argues that the trial court erred in granting Fairways' motion to disregard the jury's awards for its equipment damages under its negligence and breach-of-contract claims and in not awarding it these damages because Fairways waived the application of chapter 95, Cudd conclusively proved Fairways' liability under that chapter, and Cudd was entitled to these damages as contract damages under the terms of both the bid that Fairways accepted and the daily tickets that Fairways signed.

The jury, under both Cudd's negligence and breach-of-contract claims, awarded Cudd $77,895.96 for its "cost of repairs or replacement" to the snubbing unit. The trial court granted Fairways' motion for judgment notwithstanding the verdict in part, disregarding the jury's damage awards of $77,895.96 under both claims.

We review a trial court's granting of a motion for judgment notwithstanding the verdict under a no-evidence standard, meaning we "credit evidence favoring the jury verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009) (citing *City of Keller*, 168 S.W.3d at 823). We will uphold the jury's finding if more than a scintilla of competent evidence supports it.

36

*Id.* "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827.

Cudd's snubbing bid contained a term stating, "tools lost or damaged beyond repair will be charged to customer at FOB replacement cost." Fairways' H. Gracia testified that Fairways accepted Cudd's bid. Additionally, Cudd's daily tickets included a term providing that "[a]ll rental property lost or damaged beyond repair[] shall be paid for by Customer at the actual replacement cost for like new equipment, and all damaged property which must be repaired will be repaired at Customer's cost, for which Cudd will invoice Customer." M. Garcia testified that he provided these daily tickets to G. Knape of Fairways, and both their signatures appeared on the tickets. M. Garcia also explained that the terms and conditions appeared on the back of every ticket that he signed and he provided to Knape.[18] Knape agreed that he saw these tickets daily.

In support of the amount of damages, Cudd's E. Goodman testified that the occurrence damaged two slip bolts, two "black devices," a spool, and multiple other parts of the snubbing unit. Goodman stated that Cudd had made repairs to its snubbing unit and the total cost of the repairs, including labor, totaled $77,895.96.

---

[18] Knape agreed that he saw tickets daily, but he could not remember if he also saw the terms and conditions.

He also stated that this figure represented reasonable and customary charges for repairing the snubbing equipment.

We conclude that Cudd presented some evidence to support the jury's award of $77,895.96 to Cudd under its breach-of-contract claim for its "cost of repairs or replacement" to its snubbing unit. Accordingly, we hold that the trial court erred in disregarding this jury finding.

We sustain Cudd's cross-issue.

## Conclusion

We modify the trial court's judgment in favor of Cudd to reinstate the jury's award of $77,895.96 to Cudd under its breach-of-contract claim for its "cost of repairs or replacement" to its snubbing unit. As modified, we affirm the portion of the trial court's judgment entered in favor of Cudd. We reverse the portion of the trial court's judgment entered in favor of Patterson on its negligence claim and render judgment that Patterson take nothing on those claims. We reverse the portion of the trial court's judgment entered in favor of Patterson on its breach-of-contract claim, and we remand for further proceedings consistent with this opinion.

Terry Jennings
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

38

Justice Brown, concurring.