EAST HILL MARINE V. RINKER BOAT

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-210-CV

EAST HILL MARINE, INC. AND APPELLANTS

JOE STARK D/B/A JOE STARK MARINE

V.

RINKER BOAT CO., INC. APPELLEES

AND GAVEN HUNT

------------

FROM THE 352ND DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

I.  Introduction

Appellants East Hill Marine, Inc. and Joe Stark d/b/a Joe Stark Marine appeal the trial court’s order granting summary judgment to appellees Rinker Boat Co., Inc. and Gaven Hunt.  In their first two issues, appellants argue that the trial court erred by granting a traditional summary judgment against them on their breach of contract claims and by granting a traditional summary judgment and no-evidence summary judgment against them on their Texas Occupations Code claims.  In a third issue, East Hill Marine, solely, argues that the trial court erred by granting a traditional summary judgment against it on its Deceptive Trade Practices Act (“DTPA”) claim.  We affirm.

II.  Background Facts

In the early 1990s Stark became an authorized Rinker Boats dealer in Fort Worth, Texas.  Stark and appellees did not enter into a written agreement documenting the terms of the dealer agreement, but instead, orally agreed that Stark could be the authorized dealer in Fort Worth for as long as he wanted to with no minimum purchase requirements.  Stark continued to be a Rinker dealer in Fort Worth until 2004.  During this time, appellees listed Stark’s business on its website as an authorized dealer and corresponded with Stark as a dealer. Stark paid no money to appellees in exchange for this agreement.

On September 23, 2004, appellees sent a letter to Stark informing him that they were terminating their dealership agreement with him because of lack or loss of sales performance and sub par performance in the areas of customer service and satisfaction.  The letter informed Stark that the agreement would terminate in 90 days and appellees would honor any reasonable orders within the 90-day period.

East Hill Marine entered into a verbal dealer agreement with appellees in March 2004.  East Hill Marine claims that appellees made the same oral representations to it that they had made to Stark; specifically, that East Hill Marine would be the exclusive Rinker dealer in North Dallas for as long as East Hill Marine wanted to be.  East Hill Marine also claims that, under the agreement, East Hill Marine did not have to purchase a minimum number of boats to remain a Rinker dealer.  Larry Cochran, the president of East Hill Marine, requested a written agreement, but appellees informed him that they did not have a written agreement, nor would they provide him with one.  Regardless, East Hill Marine became a Rinker dealer and purchased boats from appellees for approximately seven months.  Like Stark, East Hill Marine paid no money to appellees to become an authorized dealer.  On November 1, 2004, appellees called East Hill Marine and stated that they were terminating East Hill Marine’s dealership status.  On December 13, 2004, appellants sued appellees for breach of their dealer agreements and for violating the Texas Occupations Code as it relates to boat dealers and manufacturers.  East Hill Marine, solely, also asserted a claim against appellees under the DTPA.  In November 2005, appellees filed a traditional motion for summary judgment on all three claims and an additional no-evidence motion for summary judgment on the Occupations Code claims, all of which the trial court granted.  This appeal followed.

III.  Standards of Review

A.  Traditional Summary Judgment

A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim.  
IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason
,
 
143 S.W.3d 794, 798 (Tex. 2004); 
see
 
Tex. R. Civ. P.
 166a(b), (c).  When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant’s favor.
  
IHS Cedars Treatment Ctr.
, 143 S.W.3d at 798. 

A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense.  
Rhone-Poulenc, Inc. v. Steel
, 997 S.W.2d 217, 223 (Tex. 1999); 
see
 
Tex. R. Civ. P.
 166a(b), (c)
.  To accomplish this, the defendant-movant must present summary judgment evidence that establishes each element of the affirmative defense as a matter of law.  
Ryland Group, Inc. v. Hood,
 924 S.W.2d 120, 121 (Tex. 1996).  When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant’s favor.  
IHS Cedars Treatment Ctr.
,
 
143 S.W.3d at 798.

B.  No-Evidence Summary Judgment

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that there is no evidence to support an essential element of the nonmovant’s claim or defense.  
Tex. R. Civ. P.
 166a(i).  The motion must specifically state the elements for which there is no evidence.  
Id.; Johnson v. Brewer & Pritchard, P.C., 
73 S.W.3d 193, 207 (Tex. 2002).  The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact.  
See
 
Tex. R. Civ. P.
 166a(i) & cmt.; 
Sw. Elec. Power Co. v. Grant, 
73 S.W.3d 211, 215 (Tex. 2002).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion.  
Sudan v. Sudan,
  199 S.W.3d 291, 292 (Tex. 2006).  If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper.  
Moore v. K Mart Corp.
, 981 S.W.2d 266, 269 (Tex. App.—San Antonio 1998, pet. denied).

When a party moves for summary judgment under both rules 166a(c) and 166a(i), we will first review the trial court’s judgment under the standards of rule 166a(i).  
Ford Motor Co. v. Ridgway, 
135 S.W.3d 598, 600 (Tex. 2004).  If the nonmovant failed to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether the movant’s summary judgment proof satisfied the less stringent rule 166a(c) burden.  
Id.

IV.  Texas Occupations Code

In their first issue, appellants argue that the trial court erred by granting traditional and no-evidence summary judgments against them on their Occupations Code claims.
(footnote: 1)  Appellees’ no-evidence motion was based on the argument that the Occupations Code requires a written agreement between a manufacturer and a dealer, and in this case, there was no evidence of a written agreement between the parties.  Appellees’ traditional summary judgment motion was based on the argument that appellants were estopped and quasi-estopped from bringing their claims because they violated the Occupations Code by not entering into a written contract.

A.  Applicable Law

The Occupations Code states that a boat manufacturer may not terminate an agreement with a dealer unless there is good cause for the termination.  
Tex. Occ. Code Ann. 
§ 2352.053(a) (Vernon 2004).  Section 2352.051 further requires that a boat manufacturer and a dealer enter into an agreement that complies with section 2352.052.  
See id.
 § 2352.051.  Under section 2352.052, the agreement must contain the following terms: 

(1)  the dealer’s location, territory, or market area; 

(2)  the length of the agreement; 

(3)  any performance or marketing standards; 

(4)  any working capital, inventory, facility, equipment, or tool standards; 

(5)  provisions for termination or nonrenewal of the agreement and the designation of a successor dealer in the event of the dealer’s death or disability; 

(6)  the obligations of the manufacturer, distributor, and dealer in the preparation and delivery of and warranty service on new boats and new outboard motors; 

(7)  the obligations of the manufacturer, distributor, and dealer on termination of the agreement, including inventory of new boats and new outboard motors, parts inventory, equipment, furnishings, special tools, and required signs; and

(8)  dispute resolution procedures.

Id.
 § 2352.052(a).  Section 2352.001 of the Occupations Code defines “agreement” as a “
written
 agreement between a manufacturer . . . and a dealer for the purchase and sale of new boats or new outboard motors.”  
Id.
 § 2352.001(1) (emphasis added).

B.  Analysis

Under section 2352.051, a dealer and a manufacturer have a mutual obligation to enter into a written agreement before selling or buying boats.  
See id.
 §§ 2352.001, .051.  Appellants argue that section 2352.053 “provides that a manufacturer such as Rinker may not terminate 
dealers 
such as [appellants] unless there exists good cause.”  [Emphasis added.]  However, the statute actually states that a manufacturer “may not terminate an 
agreement 
unless there is good cause.”  
Id.
 § 2352.053(a) (emphasis added).  While appellants may be correct that the Occupations Code was designed to protect small boat dealers from large and powerful manufacturers, the clear language of the statute requires both parties to enter into a 
written 
agreement.  
See id.
 § 2352.051.  Therefore, any verbal agreements between appellants and appellees are not subject to section 2352.053’s prohibition on termination without good cause.  
See id
. §§ 2352.001, .053.

Appellants next claim that various pieces of correspondence, purchase orders, purchase invoices, and other documents were sufficient to constitute written agreements between them and appellees.  However, appellants failed to demonstrate to the trial court how these various documents satisfied the Occupation Code’s eight requirements for written agreements.  
See id.
 § 2352.052(a).  Further, appellants conceded in their depositions and petition that no written agreements existed.  Appellants also claim that even if there were no written agreements, section 2352.052(b) makes the Occupations code applicable to their oral agreement, and thus required “that there be protections afforded [appellants] from unilateral, draconian termination by Rinker.”  Section 2352.052(b) states that “a dealer agreement and any transaction subject to this chapter must comply with the requirements of this section.”  
Id. 
§ 2352.052(b).  We disagree with appellants’ interpretation; section 2352.052(b) refers to “this chapter,” meaning chapter 2352 of the Occupations Code and its corresponding sections.  Under section 2352.001(1), all agreements under chapter 2352 must be in writing.  
Id.
 § 2352.001(1).  Thus, section 2352.052(b) applies only to written agreements.   

Since there were no agreements complying with the Occupations Code, appellees could not have violated section 2352.053, and the 
trial court did not err by granting appellees’ no-evidence motion for summary judgment on those claims.  
See id.
 § 2352.051.  
Because the no-evidence summary judgment against appellants was proper, we need not analyze whether the trial court erred by granting traditional summary judgment in favor of appellees on those claims.  
See
 
Ford Motor Co., 
135 S.W.3d at 600
.
 
 Accordingly, we overrule appellants’ first issue. 

V.  Breach of Contract Claims

In their second issue, appellants claim that the trial court erred by granting summary judgment in favor of appellees on their statute of frauds defenses to appellants’ breach of contract claims.  Appellees’ statute of frauds defenses included two reasons why the verbal contracts were unenforceable: the contracts were for the sale of goods over $500 and the contracts could not be completed within one year.  We only address the sale of goods argument because it is dispositive.

A.  Applicable Law

A contract for the sale of goods valued at more than $500 is subject to the statute of frauds.  
Tex. Bus. & Comm. Code Ann. § 2.201
(a) (Vernon 1994).  Where a contract contains a mixture of sales and services, section 2.201 applies if the sale of goods is the “dominant factor” or “essence” of the transaction.  
See Cont’l Casing Corp. v. Siderca Corp.
, 38 S.W.3d 782, 787 (Tex. App.—Houston [14th Dist.] 2001,
 
no pet.); 
WesTech Eng'g, Inc. v. Clearwater Constructors, Inc.,
 835 S.W.2d 190, 197 (Tex. App.—Austin 1992, no writ).
  
Appellees and appellants dispute whether the thrust of each contract was the dealership agreement or the sale and purchase of goods.  Thus, to determine whether section 2.201(a) applies here, we must decide whether the dominant factor or essence of each alleged agreement is a “contract for the sale of goods.”  
See
 
Tex. Bus. & Comm. Code Ann. 
§ 2.201
(a);
 Cont’l Casing Corp.
, 38 S.W.3d at 787.

B.  Analysis 

Appellants argue that they made oral agreements with appellees that authorized them to purchase boats indefinitely.  According to appellants, these agreements did not involve the purchase of goods for an amount over $500, but instead were agreements that they would act as appellees’ boat dealers.  Thus, argue appellants, the contracts were for services, not for goods.  We disagree.

First, the boats to be supplied by appellees were without question “goods” as defined by the Business and Commerce Code (“UCC”). 
 See
 
Tex. Bus. & Comm. Code Ann. 
§ 2.105
.
 The UCC states that a “contract for sale” includes both a present sale of goods and a contract to sell goods at a future time. 
 Id.
 § 2.106.  

A
ppellants admitted that the main purpose of their agreements with appellees was to buy boats that cost over $500 from appellees and then sell those boats in their own showrooms.  For example, Stark testified:

Q. On the boats that you have purchased from Rinker over the years, have any of them been under $500?

A.  No.

Q. What would be the lowest price of one of the boats that you purchased from Rinker?

A. We bought a — in 1992, they had an 18-foot boat that sold for approximately $16,000, dealers cost.

Q. That’s what you paid Rinker for the boat?

A. Yes sir.

Q. That’s the lowest price of a boat you can remember buying from them?

A. Yes, sir.

Q. Is the main gist of the agreement between you and Rinker was for you to buy boats from them?

A. I guess so.

Q. You many have other accessories to go with it, but the main gist of your agreement with Rinker was that you would buy boats from them as you contend for as long as you wanted?

A. Yes, sir.

In discussing East Hill Marine’s contentions as to the terms of the oral agreement, East Hill Marine’s president testified as follows,

Q. What were Rinker’s obligations?

A. To manufacture and deliver boats.  To assist in marketing materials.  We discussed having boats with birthdays and would they assist in disposing of those.  All the obligations any manufacturer has.  

Q. Well, what were the obligations you agreed upon?

A. That I would be the Dallas dealer exclusively.  That if and when they expected Joe Stark to go away, that I would have part of Fort Worth also.

Q. Any other obligations y’all agreed upon for Rinker?

A. I don’t recall.

Q. What were your obligations, East Hill’s?

A. Basically looking for a floor plan, insurance, a good location.  Take it to the Boat Show, represent the line.  

. . . . 

Q. You’ve already told me that there wasn’t a written agreement, correct?

A. Correct.

Q.  Did you ever offer to purchase new boats or actually purchase new boats from Rinker without having a written agreement?

A. Yes.

Q. Your claims against Rinker involved, in part, a transaction in which you claim you ordered $575,000 in new units; is that correct?

A. I had more orders than that.

Further, the alleged oral agreements are properly characterized as distributorship agreements.  Although only one Texas case
(footnote: 2) has discussed whether a distributorship agreement is a “contract for the sale of goods” under the UCC, the overwhelming majority of jurisdictions that have considered the question have concluded that distributorship agreements are subject to the UCC.
(footnote: 3) 
 We will follow the majority rule in holding that the dominant factor or essence of each of the alleged agreements in this case was a contract for the sale of goods, and thus each was subject to the UCC.

We conclude that appellants’ arguments that there were sufficient writings to constitute agreements under the UCC are unpersuasive, especially in light of the admissions in their depositions and pleadings that no written contracts existed between any parties.  Therefore, because the contracts were for the sale of goods over $500, and the contracts were not in writing, the trial court properly granted summary judgment in favor of appellees on this statute of frauds defense.  
See
 
Tex. Bus. & Comm. Code Ann. § 2.201
(a).  This holding disposes of the entire issue, so we need not address whether summary judgment was proper on the ground that the contracts could not be performed within one year.  Accordingly, we overrule appellants’ second issue. 

VI.  DTPA Claim

East Hill Marine was the only appellant that asserted a DTPA claim against appellees.  The trial court granted traditional summary judgment in favor of appellees on this claim, holding that the set of transactions between East Hill Marine and appellees involved consideration of more than $500,000.    

A.  Applicable Law

The Texas Business and Commerce Code exempts from the DTPA causes of action arising from a transaction or set of transactions relating to the same project if the total consideration by the consumer amounts to more than $500,000. 
 
Id
. § 17.49
(g) (Vernon Supp. 2006).  The purpose of this exemption is to maintain the DTPA as a viable source of relief for consumers in small transactions and to remove litigation between businesses over large transactions from the scope of the DTPA.  
See Citizens Nat’l Bank v. Allen Rae Invs., Inc.
, 142 S.W.3d 459, 473-74 (Tex. App.—Fort Worth 2004, no pet.). 

B.  Analysis

In the following portion of his deposition, East Hill Marine’s president, Larry Cochran, admitted that East Hill Marine’s damages claims against appellees involved total consideration of at least $859,513:

Q.  So was setting up and running East Hill and buying boats your . . . your project?

A. Uh-huh

Q. Is that a “yes”?

A. “Yes.”  Sorry.

. . . .

Q. Your claims against Rinker involved, in part, a transaction in which you claim you ordered $575,000 in new units; is that correct?

A. I had more orders than that.

. . . .

Q. But my question is, your claims in this lawsuit involve, in part, a transaction which you claim you ordered $575,000 or more in new units?

A. Yes.

Q. And that’s—that figure was money that you were going to pay Rinker to purchase boats so that you could then sell them on to end customers?

A. Yes.

. . . .

Q. So your—claims, in part, arise out of a claim for $859,513 in orders?

A. And quite possibly there was more, but that’s what I had here.

In its petition, East Hill Marine sought recovery of ten years of lost profits, which would have included the lost profits on the $859,513 that East Hill Marine promised to pay appellees for boats.  In order to avoid the DTPA exemption for transactions over $500,000, however, East Hill Marine argues that the sole transaction it is suing appellees on under the DTPA is its application to sell Rinker boats.  According to East Hill Marine, at the time the dealer relationship was established, there was no promise to pay more than $500,000; instead, there was an agreement under which East Hill Marine could theoretically never purchase a boat.

This argument fails to address the fact that within months after East Hill Marine established its initial agreement with appellees, East Hill Marine promised to pay at least $859,513 for new boats.  Hence, East Hill Marine did not apply to sell Rinker boats so that it could simply have that option and never use it; it applied to be a Rinker boat dealer so that it could purchase boats and then sell them in its showroom for profits.

Because East Hill Marine promised to pay appellees $859,513 and then sued to recover the lost profits on this amount, East Hill Marine’s transactions with appellees exceed the $500,000 limit imposed by the DTPA.  
See Citizens Nat’l Bank
, 142 S.W.3d at 473 (holding that sets of transactions related to the same project can be valued collectively under the DTPA).  The trial court did not err by granting traditional summary judgment on East Hill Marine’s DTPA claim.  Accordingly, we overrule East Hill Marine’s third issue.

VII.  Conclusion

Having overruled all three issues, we affirm the trial court’s summary judgment order.

TERRIE LIVINGSTON

JUSTICE

PANEL A: CAYCE, C.J.; LIVINGSTON and GARDNER, JJ.

DELIVERED: June 21, 2007

FOOTNOTES
1:
Appellants sought damages against appellees for terminating their dealership agreements without good cause and without written notice.  

2:
See Cont’l Casing Corp.
, 38 S.W.3d at 787-88 (holding that an agreement between a pipe manufacturer and a dealer was a distributorship agreement and was covered under the UCC).

3:
The courts in at least eighteen jurisdictions have applied the UCC to distributorship agreements. 
 See AKA Distrib. Co. v. Whirlpool Corp.,
 137 F.3d 1083, 1085 (8th Cir. 1998) (applying Minnesota law); 
Am. Suzuki Motor Corp. v. Bill Kummer, Inc.,
 65 F.3d 1381, 1385-86 (7th Cir. 1995) (applying Wisconsin law); 
Intercorp, Inc. v. Pennzoil Co.,
 877 F.2d 1524, 1527-28 (11th Cir. 1989) (applying Alabama law); 
Monarch Beverage Co. v. Tyfield Imps., Inc.,
 823 F.2d 1187, 1190 (7th Cir. 1987) (applying Indiana law); 
Corenswet, Inc. v. Amana Refrigeration, Inc.,
 594 F.2d 129, 134 (5th Cir. 1979) (applying Iowa law); 
L & M Enters., Inc. v. BEI Sensors & Sys. Co.,
 45 F. Supp.2d 879, 885 (D. Kan. 1999), 
aff'd,
 231 F.3d 1284 (10th Cir. 2000) (applying Kansas law); 
Glacier Optical, Inc. v. Optique Du Monde, Ltd.,
 816 F. Supp. 646, 652-53 (D. Or. 1993), 
aff'd,
 46 F.3d 1141 (9th Cir. 1995) (applying Washington law);
 
Paulson, Inc. v. Bromar, Inc.,
 775 F. Supp. 1329, 1333 (D. Haw. 1991) (applying Hawaii law);
 Babst v. FMC Corp.,
 661 F. Supp. 82, 87-88 (S. D. Miss. 1986) (applying Mississippi law);
 Artman v. Int’l Harvester Co.,
 355 F. Supp. 482, 486 (W.D. Pa. 1973) (applying Pennsylvania law);
 
PCS Joint Venture, Ltd. v. Davis,
 465 S.E.2d 713, 714 (Ga. Ct. App. 1995);
 Leibel v. Raynor Mfg. Co.,
 571 S.W.2d 640, 643 (Ky. Ct. App. 1978); 
Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc.,
 454 A.2d 367, 376 (Md. Ct. Spec. App. 1983); 
Meuse-Rhine-Ijssel Cattle Breeders of Canada, Ltd. v. Y-TEX Corp., 
590 P2d 1306, 1310-11 (Wyo. 1979
) (concluding that a distributorship is not contemplated within the UCC definition of “goods”);
 
Custom Commc’ns Eng'g, Inc. v. E.F. Johnson Co.,
 636 A.2d 80, 84-85 (N.J. Super. Ct. App. Div. 1993); 
United Wholesale Liquor Co. v. Brown-Forman Distillers Corp.,
 775 P.2d 233, 235-36 (N.M. 1989); 
Sanyo Elec., Inc. v. Pinros & Gar Corp.,
 174 A.D.2d 452, 453 (N.Y. App. Div. 1991);
 
Quality Performance Lines v. Yoho Auto., Inc.,
 609 P.2d 1340, 1342 (Utah 1980).