**Affirm and Opinion Filed March 1, 2024**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-22-00522-CV**

**RHINO LININGS CORPORATION, Appellant/Cross-Appellee**
**V.**
**2X2 PARTNERSHIP, LTD., Appellee/Cross-Appellant**

**On Appeal from the 44th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-18-13009**

# MEMORANDUM OPINION

Before Justices Molberg, Pedersen, III, and Nowell
Opinion by Justice Pedersen, III

Rhino Linings Corporation (Rhino) appeals the trial court's judgment, which incorporates jury findings that: Rhino committed negligent undertaking, negligent misrepresentation, fraud, and gross negligence; appellee 2X2 Partnership, Ltd. (2X2) suffered injury in the amount of $1,258,228.00 as a result of Rhino's conduct; and Rhino should pay 2X2 $750,000.00 in exemplary damages. Rhino raises five issues in this Court, alleging that (1) 2X2 relies on improper "contort" claims; (2) 2X2's negligent undertaking claim fails on legal and factual bases; (3) 2X2's fraud and negligent misrepresentation claims fail for lack of an actionable

misrepresentation; (4) legally insufficient evidence supports the actual damages award for all claims; and (5) the punitive damages award fails because the jury was not unanimous in its findings. In a single cross-issue, 2X2 contends that the trial court improperly granted summary judgment before trial, dismissing its claim under the Texas Deceptive Trade Practices Act (the DTPA). We affirm the trial court's judgment.

# I.
## BACKGROUND

2X2 owned a large warehouse, constructed in 1979. In 2015, the original metal roof on the building, which spanned approximately 150,000 square feet, had developed approximately twenty-five leaks. One of 2X2's owners, Michael Adell, met with Don Chewning, Rhino's Global Sales Manager for protective coatings, to learn about the waterproof coating that Rhino manufactures. Chewning explained that Rhino did not do the roofing work itself; 2X2 would need to contract with a Rhino-qualified applicator. He recommended Bill Potter and his company, Mastersson Roofing and Spray Foam LLC (Mastersson). Chewning said Potter was Rhino-qualified, that he was good applicator of Rhino's coating, and that he was the person Chewning would hire if he were doing his own roof. 2X2 did contract with Mastersson and agreed to pay more than $500,000 for the complete job, which included materials and installation. After the work was finished, 2X2 signed a

warranty agreement with Rhino (the Warranty). The Warranty covered Rhino's products but not any misapplication of those products.

Before long, the roof began leaking much worse than before. Potter tried numerous times to repair the roof, but he was unsuccessful. 2X2 made a claim on the Warranty, but investigation established that the fault lied with Mastersson's improper application of Rhino's products and not with the products themselves. 2X2 eventually installed a "hugger roof" above the old damaged one, at a cost of approximately $1.2 million, in order to stop the leaking.[1]

2X2 sued Mastersson for negligence. It sued Rhino for (1) negligent undertaking (related to its recommendation of Mastersson, its failure to train Mastersson, and its failure to identify the roof problems during inspections) and for (2) negligent misrepresentation and (3) fraud (both related to Rhino's recommendation of Mastersson). The jury found against Rhino on all three claims and awarded $1,258,228 on each claim. The trial court entered judgment on the jury's verdict.[2]

This appeal followed.

---

[1] The hugger roof was described during trial as a system installed six inches above the current roof, "a little structural section that you screw right to the structure, and then you just put the roof over the top."

[2] During the course of the litigation, Mastersson "ran out of money." Its attorney withdrew, and it appeared only as an "empty chair" at trial.

When comparing the responsibility of the defendants for harm caused by negligence, the jury found Mastersson 5% responsible and Rhino 90% responsible. The judgment did not award any damages from Mastersson.

## II.
### RHINO'S APPEAL

The jury made liability findings against Rhino on 2X2's claims for negligent undertaking, negligent misrepresentation, and fraud; the jury found identical actual damages—and made a corresponding exemplary damages award—for each claim. Rhino, as it must, has appealed liability and damages findings for each of the three claims. However, we must affirm the trial court's judgment for actual damages of $1,258,228 and exemplary damages of $750,000 if any one of the three claims survives Rhino's challenges on appeal. Accordingly, because it is ultimately dispositive of the appeal, we limit our consideration to Rhino's issues related to fraud.

### The Nature of 2X2's Claims

In its first issue, Rhino argues that 2X2 "artfully" pleaded its claims as tort claims when the only proper claim they could have urged against Rhino was a contract claim based on the Warranty. Rhino contends that 2X2's "contort" claims fail for three interrelated legal reasons: because the claims are all subsumed by the Warranty's merger clause; because the Warranty contains a forum-selection clause calling for claims to be brought in California; and because the economic loss rule bars recovery in tort when a plaintiff is seeking the economic loss of its contractual expectancy. Rhino urges that 2X2's failure to plead and try its Warranty claim has waived any recovery.

*Contract or Tort?*

We first address the fundamental question of the nature of 2X2's claims in this lawsuit. We agree with Rhino that our analysis must "focus the legal treatment of claims on the true nature of disputes rather than allow artful pleading to morph contract claims into [tort] causes of action to gain favorable redress under the law." *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007). We determine whether a claim properly sounds in contract or in tort by considering two factors: the source of the duty giving rise to the injury and the nature of the injury itself. *Dixie Carpet Installations, Inc. v. Residences at Riverdale, LP*, 599 S.W.3d 618, 635 (Tex. App.—Dallas 2020, no pet.) (citing *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991)).

(1)  Source of the Duty

Rhino contends that the relationship between it and 2X2 is "governed by the [W]arranty," and that the duties at issue in this case arise from that agreement. As predicate to analyzing the source of Rhino's duties in this case, we address the nature and scope of warranties generally and of this Warranty in particular. The Texas Uniform Commercial Code, adopted in the Texas Business and Commerce Code, governs a claim made pursuant to an express warranty involving a sale of goods. *Med. City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 59 n.3 (Tex. 2008). The UCC provides that: "Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates

–5–

an express warranty that the goods shall conform to the affirmation or promise."

TEX. BUS. & COM. CODE ANN. § 2.313(a)(1). Because an express warranty becomes

part of the "basis of a bargain," a warranty claim sounds in contract. *Med. City*

*Dallas*, 251 S.W.3d at 60. To summarize, a warranty embodies a seller's promise

that the goods sold will conform to its affirmation or promise.

In this case, the promise conveyed by the Rhino Warranty is contained in the

first paragraph, titled **LIMITED WARRANTY**:

> Rhino Linings Corporation, hereafter "RHINO", warrants to the original Building Owner listed above, hereafter "OWNER", that for the duration of the warranty term the coated foam roof system ("System") supplied by RHINO to the building listed above will not leak due to manufacturing defects or ordinary wear and tear by the elements. The System is limited to mean the RHINO Durafite™ brand roofing products when installed in accordance with RHINO technical specifications.

The remainder of the document compiles the terms and conditions to which the

limited warranty, quoted above, is subject. Chief among them for our purposes here

is this language from the paragraph titled **CONDITIONS AND LIMITATIONS**:

> This LIMITED WARRANTY specifically EXCLUDES from coverage damage or failure of the RHINO System caused by or resulting from:
>
> - Improper application (including surface or substrate preparation) of the RHINO System or RHINO materials.

2X2 did initially make a claim on the Warranty when the roof began leaking

again. That claim was resolved, according to the Warranty's terms, by Rhino's hiring

an expert to investigate the cause of the leaking. The investigation established that:

the roof leaks were not caused by manufacturing defects in Rhino's product; the

leaks were not caused by ordinary wear and tear by the elements; and the leaks were instead caused by Mastersson's improper application of the Rhino product. These conclusions were not challenged at trial. We conclude, therefore, that no promise made by Rhino in the Warranty is at issue in this case; 2X2 has no complaint about the product Rhino provided. Accordingly, 2X2's claims do not arise under a contractual duty.

Instead, 2X2 urges tort claims grounded in negligence and fraud. Tort duties do not flow from the parties' agreement; "tort duties are 'imposed by law—apart from and independent of promises made and therefore apart from the manifested intention of the parties—to avoid injury to others.'" *Dixie Carpet Installations*, 599 S.W.3d at 635 (quoting *DeLanney*, 809 S.W.2d at 495). Texas law recognizes such duties (1) to exercise reasonable care in performing a voluntarily assumed undertaking, *Freyer v. Lyft, Inc.*, 639 S.W.3d 772, 789 (Tex. App.—Dallas 2021, no pet.) (negligent undertaking); (2) to exercise reasonable care in communicating information for the guidance of others in their business when one has a pecuniary interest in the matter, *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653–54 (Tex. 2018) (negligent misrepresentation); and (3) to refrain from making a knowingly  material misrepresentation with the intent that others act upon it, *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (fraud). These are the duties 2X2 charges Rhino with violating.

(2)  Nature of the Injury

We have said that this second factor most often determines which duty has been breached and, therefore, whether the claim is properly one for contract or tort. *Clark v. PFPP Ltd. P'ship*, 455 S.W.3d 283, 289 (Tex. App.—Dallas 2015, no pet.). "When the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Id.* Rhino contends that the injury for which 2X2 seeks recovery is the loss of its "contract expectancy," and it artfully describes that contract expectancy as "a water-tight roof." It is possible—perhaps likely—that 2X2 had such a contract expectancy in its agreement with Mastersson. But the 2x2–Mastersson agreement is not before us.

Rhino's Warranty cannot be compared to Mastersson's construction contract. The only contractual expectations 2X2 was entitled to were those set forth in the Warranty. If Rhino's product had leaked because of a manufacturing defect or because of ordinary wear and tear by the elements, then Rhino would have been obligated to provide replacement material and labor free of charge to fix the leak. Had that contractual expectation been thwarted, then a claim on the Warranty would indeed have arisen under the terms of the parties' agreement, and that claim would have sounded in contract. But there is no pleading or evidence to support an argument that that was the claim 2X2 had or should have made.

2X2's injury—in the case of its claim for fraud—was its reliance on Rhino's knowing misrepresentation concerning Potter's being qualified to apply Rhino's

products on 2X2's roof, which led to 2X2's hiring him. The fraud claim was based on a tort duty; the injury was caused by Rhino's violation of its duty to refrain from making a knowingly material misrepresentation with the intent that 2X2 would act upon it, i.e., to deal honestly with a purchaser of its product. *See Italian Cowboy*, 341 S.W.3d at 337. 2X2's injury was not caused by a failure of Rhino's products. Accordingly, we conclude 2X2's fraud claim sounded in tort, not contract.

*Rhino's "Contort" Contentions*

Despite the fact that 2X2 had no complaint under the Warranty, Rhino contends that the Warranty still controls the type of claims 2X2 could bring. It makes three arguments to this end.

(1)    The Merger Clause

Rhino argues that when 2X2 and Rhino signed the Warranty, any preexisting tort claims 2X2 might have had were merged into the Warranty, leaving 2X2 with no possible claim other than breach of the Warranty. Rhino quotes and relies upon one sentence in the Warranty:

> THIS WARRANTY INCLUDES THE COMPLETE AND EXCLUSIVE AGREEMENT BETWEEN THE BUILDING OWNER AND RHINO AND SUPERSEDES ANY AND ALL PRIOR ORAL AND WRITTEN AGREEMENTS OR REPRESENTATIONS.

Because the following sentence clarifies precisely the effect of that sentence, we set it forth as well:

> THE WARRANTY OBLIGATION OF RHINO AND THE REMEDY STATED HEREIN IS THE SOLE AND EXCLUSIVE AGREEMENT,

REMEDY AT LAW OR IN EQUITY *FOR DEFECTS IN MATERIAL SUPPLIED BY RHINO*. (Emphasis added.)

Together, these sentences set forth the "exclusive agreement" between Rhino and 2X2 concerning remedies for defects in the materials supplied by Rhino. They forbid non-Warranty claims based on such defects.

We construe a contract by ascertaining and giving effect to the parties' intentions as those intentions are expressed in the writing itself. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012). Therefore, we presume the parties intended what the words of their contract say, and we interpret contract language according to its plain, ordinary, and generally accepted meaning unless the contract directs us to read it differently. *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018). We will not expand the scope of the plain meaning of contract language. *See, e.g., Pleasant Grove Indep. Sch. Dist. v. FieldTurf USA Inc.*, 648 S.W.3d 608, 615 (Tex. App.—Texarkana 2022, pet. denied) (warranty's plain language limiting remedy to repair or replacement will not be expanded to monetary damages).

The plain language of the Warranty is limited to issues of defect in the products Rhino supplied. Rhino cites no case—and we have found none—that would allow a warranty (or any contract) through a merger clause to bar claims that are not related to the subject matter of the warranty.

Because 2X2's claims do not relate in any fashion to defects in material supplied by Rhino, those claims are not barred by this exclusive remedy, or merger, provision.

(2)     Forum Selection Clause

The Warranty provides that following unsuccessful mediation, any claim on the Warranty is to be brought in "the appropriate state or federal court in the State of California." This lawsuit involves no claim on the Warranty, so the forum-selection clause is not relevant.

(3)     The Economic Loss Rule

Finally, Rhino argues that the economic loss rule bars 2X2's contort claims. That rule "generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014). But the rule does not bar all tort claims simply because the parties have a contractual relationship. *Id.* A party's claim sounds in tort "when the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit." *Id.*

As we have stated the only contractual expectancy 2X2 had under the Warranty is that if Rhino's product had leaked because of a manufacturing defect or because of ordinary wear and tear by the elements, then Rhino would have been

obligated to provide replacement material and labor free of charge to fix the leak. Because the predicate conditions for a claim on the Warranty never occurred, i.e., no leak at 2X2's building was caused by a defect in Rhino's product, there was no economic loss of a contractual benefit here. The economic loss rule is simply not applicable in this case.

We overrule Rhino's first issue.

### Sufficiency of Evidence of Elements of Fraud

Rhino contends that there is no evidence of two elements of 2x2's claim for fraud: an actionable misrepresentation and actual damages that meet the submitted measure of damages. We review the legal sufficiency of the evidence by considering all the evidence in the light most favorable to the judgment. *Orca Assets G.P.*, 546 S.W.3d at 653. We ask whether the evidence at trial—crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not—would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

#### *An Actionable Misrepresentation*

In its third issue, Rhino argues there is no evidence that its representative made an actionable misrepresentation to 2X2. Rhino addresses two statements made by Chewning to Adell concerning Potter and his company—that Potter was "a good applicator" and that he was "Rhino-qualified"—and contends that neither can be an actionable misrepresentation. Calling Potter a "good applicator," Rhino insists, was

mere puffery. *See Dowling v. NADW Mktg., Inc.,* 631 S.W.2d 726, 729 (Tex. 1982) ("Puffery is an expression of opinion by a seller not made as a representation of fact."). And calling him "Rhino-qualified," Rhino asserts, "meant only that Mastersson was eligible to buy products from Rhino," which was a true statement.

A material representation is one that "a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Smith v. KNC Optical, Inc.*, 296 S.W.3d 807, 812 (Tex. App.—Dallas 2009, no pet.). A pure expression of opinion is not a representation of material fact and cannot provide a basis for a fraud claim. *Italian Cowboy*, 341 S.W.3d at 337–38. Whether a statement is an assertion of material fact or merely one of opinion or puffery depends on the circumstances in which the statement is made. Transp. *Ins. Co. v. Faircloth,* 898 S.W.2d 269, 276 (Tex. 1995). Relevant circumstances include the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and the hearer's knowledge, and whether the statement relates to the present or the future. *Id.* To glean a fair picture of the Rhino statements at issue, we set forth Adell's testimony from the relevant portion of his meeting with Chewning:

> I said, does Rhino install the roof?
>
> And he said, no. It takes a Rhino-qualified applicator. It's got to be a qualified person, not just anyone can do it.
>
> And I said, okay. Well, how do we go about finding a Rhino-qualified applicator?

And he said, I can recommend one to you.

So I said, who would that be?

And he said, Bill Potter. Mastersson Roofing, he is the owner, and he is in Temple, Texas.

And I said, why Bill?

And he said, because Bill is good. He is Rhino -- he is a Rhino-qualified applicator, and I have seen roofs that he has done.

So, you know, we talked a little bit about that. And I said, What about price? And he said, I can't—I can give you a ballpark, but I really can't give you a price because we work directly with the Rhino-qualified applicator. And if in fact we continue to have this conversation, to the point where you meet Bill, I will work out pricing. We get the pricing to the Rhino-qualified applicator, and in turn the Rhino-qualified applicator will give you what's called—or at least I call it a turnkey price, where installation, material, your roof will be installed.

So I said, okay. . . .

I said—I said to Don, if this were your building, who would you use?

And he said, without hesitation, absolutely Mastersson.

We acknowledge at the outset that Chewning attended this meeting in his role as a Rhino salesman. Statements of his opinion concerning his product, made as a seller to a prospective buyer, would often qualify as mere puffery rather than as misrepresentations of fact. *See Dowling*, 631 S.W.2d at 729. But Chewning was not praising Rhino products in this exchange. Instead, he was providing factual information necessary for Adell to have if he chose to use Rhino products in his roof repair:  he would need to hire an independent applicator; only a qualified person could apply the product; Rhino determined which applicators were qualified to apply

its product; Potter was good at applying the product; he was qualified by Rhino to do so; and Chewning knew Potter's qualifications because he had seen roofs Potter had done. These representations were specific,[3] and they were rooted in Chewning's superior knowledge about installers of Rhino products. *See Faircloth,* 898 S.W.2d at 276. The statements were not in the nature of general public advertising; they were made in response to Adell's questions and were tailored to Adell's circumstances. Certainly Chewning would have expected Adell to attach importance to the statements in determining his choice of actions. *See Smith*, 296 S.W.3d at 812.

Moreover, the key language used, and repeated, by Chewning was not vague or empty in meaning. Chewning testified that he told Adell that Potter was qualified to do the job, and he agreed that "qualified" in that regard meant competent and trained.[4] He agreed that he told Adell that Potter was "Rhino-qualified," but he also testified to the following:

- No one at Rhino had ever told him that they had personally observed Mastersson's work.

- Before he recommended Potter to Adell, he did not know how many roofs Potter had ever installed a coating product on.

---

[3] We note that after the initial statements concerning Potter's qualifications, Chewning stated "we talked a little bit about that." To the extent Chewning needed further clarification or expansion on these points, jurors could reasonably assume that the "talk" provided any further specifics he required.

[4] Reasonable jurors could not accept, as Rhino posits, that "Rhino-qualified" in this context meant only "that Mastersson was eligible to buy products from Rhino." When asked if Rhino installed the roof, Chewning stated, "It takes a Rhino-qualified applicator. It's got to be a qualified person, not just anyone can do it." Chewning's testimony confirms he knew what he was saying, and Adell's testimony confirms he understood what Chewning was saying. The plain meaning of the word "qualified" was not "merely Adell's unwarranted gloss on the statement," as Rhino contends.

- Applying coating to two metal roofs (according to Potter's testimony, that was his experience before the 2X2 job) was not significant experience, and probably did not make Potter a competent and trained applicator.

- Before recommending Potter to Adell, he had only visited one roofing project that anyone from Masterson had worked on. That one project was only 10,000 to 15,000 square feet, and the roof was made of concrete, not metal.

- He had never had any training himself, at Rhino or elsewhere, on how to apply this type of waterproof coating on a metal roof.

- To become a Rhino-qualified applicator, Potter was required to attend a one-week course. As far as Chewning knew, that was Potter's only training. The class did not spend one minute on how to apply products to roofs. Chewning knew this when he recommended Potter to Adell.

We conclude that Chewning represented to Adell that Rhino had determined that Potter was competent and trained to perform 2X2's roofing job. Viewing the evidence in the light most favorable to the verdict, we conclude that rational jurors could have found that was an actionable misrepresentation. *See City of Keller*, 168 S.W.3d at 827.

We overrule Rhino's third issue.

### *Actual Damages*

In its fourth issue, Rhino contends that there is no evidence to support the identical damages amount the jury found for the three different measures of actual damages. Here, our focus is on the damages awarded for fraud.

–16–

The trial court submitted Question No. 11 to determine actual damages for 2X2's claim for fraud. That question instructed the jury to consider only the following measure of damages: "The reasonable and necessary cost to fix the damage to 2X2's property, if any, that was proximately caused by fraud." Rhino does not challenge the validity of this measure of damages. The jury answered Question No. 11: $1,258,228. The evidence is undisputed that 2X2 paid that amount to have the hugger roof built over the roof that Mastersson attempted to repair.

Rhino contends that the evidence of the awarded amount does not match the submitted damages measures. More specifically, Rhino argues that the cost of the new roof was not "[t]he reasonable and necessary cost to fix the damage to 2X2's property" caused by the fraud. Instead, according to Rhino, the cost of the new roof was an upgrade; it was more than a fix, meaning that 2X2 was overcompensated for its injury.

We agree with Rhino insofar as we recognize that compensation is the chief purpose of damages awards in tort cases. *J & D Towing, LLC v. Am. Alternative Ins. Corp.*, 478 S.W.3d 649, 655 (Tex. 2016). And "[r]easonable and proper compensation must be neither meager nor excessive, but must be sufficient to place the plaintiff in the position in which he would have been absent the defendant's tortious act." *Id.* We review the evidence, therefore, to determine whether the award of the cost of the hugger roof was "reasonable and proper compensation," i.e., whether the cost of the new roof was in reality the cost to fix the damage to 2X2's

–17–

property and to put 2X2 in the position in which it would have been absent Rhino's tortious act. *See id.*

Our review of the record has identified the following evidence concerning the issue of fixing 2X2's property after Mastersson's roofing efforts had failed:

- It was undisputed that 2x2's building had approximately twenty-five leaks before Mastersson's work; it had more than 200 leaks less than one year later.

- With advice from a licensed engineer, Adell learned that there were only two possible ways to stop the leaking: tearing off and replacing the existing roof, or installing the hugger roof over the existing roof.

  - Tearing off and replacing the existing roof would have interrupted the work of Adell's building's tenants.

  - Adell priced both of the options. Tearing off and replacing the existing roof would have cost more than the cost of the hugger roof.

- Roofing expert Stephen Patterson testified that when Mastersson misapplied the Rhino product, it altered the slope of the building. It created "almost a mile of dams" across the roof that caused water to back up on the roof every time it rained, submerging the roof's unsealed joints (or laps), and causing leaks.

  - Other proposed "fixes" like applying another product on top of the Mastersson work, would not have cured the fundamental problem of the dams.

  - Tearing off and replacing the roof would be costly and would expose the inside of the building and people working there, causing "just a mess."

  - The hugger roof would fix the leaking because it would be independent of anything underneath it. It was reasonable to choose that option; it is the option Patterson would have recommended.

–18–

o After investigating the cost of the hugger roof, he concluded that 2X2 paid a fair and reasonable amount for it.

Our review of the record did not identify any evidence establishing that a different method of fixing the leaking was possible. Rhino does not point to any such evidence; it relies solely on its overcompensation argument. It is possible, albeit under unusual and limited circumstances, that replacement may be the only reasonable way to fix damage to property and to put an owner of the property in the position in which it would have been absent a tortious act. *See, e.g.*, *Perry Roofing Co. v. Olcott*, 722 S.W.2d 538, 541 (Tex. App.—Fort Worth 1986) (after roof was improperly installed, expert and adjuster opined only way to truly fix roof was by replacement), *aff'd*, 744 S.W.2d 929 (Tex. 1988). We conclude that the above-cited evidence, viewed in the light most favorable to the verdict, would have allowed reasonable and fair-minded jurors to reach the award of $1,258,228 as the amount necessary "to fix the damage to 2X2's property." *See City of Keller*, 168 S.W.3d at 827.

We overrule Rhino's fourth issue.

**Exemplary Damages**

In its fifth issue, Rhino contends that the trial court erred in awarding punitive damages because the jury did not unanimously answer the questions necessary for

such a recovery.[5] Punitive, or exemplary, damages may be awarded only if the jury was unanimous in finding (1) liability for and (2) the amount of those damages awarded. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(d). As to liability for exemplary damages, the jury affirmatively answered that the harm they had found to 2X2 resulted from fraud (Question No. 13) and gross negligence (Question No. 12) on Rhino's part. These are appropriate grounds for an award of exemplary damages. *See id.* § 41.003(a)(1), (3). And as to the amount of exemplary damages, the jury found $750,000. Rhino challenges the award, arguing that the jury's answers were not unanimous.

*The Jury's Findings*

We begin by setting forth the relevant jury findings.

Liability: Gross Negligence

The trial court's gross negligence question was introduced with the following two instructions:

[1]	Answer Question No. 12 only if you unanimously answered "Yes" to at least one of Question 1 and 5 with regard to Rhino. Otherwise, do not answer the following question.

[2]	To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon vote of ten or more jurors. Otherwise, you must not answer the following question.

---

5 Rhino also argues under this issue that the absence of a valid actual damages award renders the trial court's exemplary damage award improper. However, we have upheld the award of actual damages for fraud, so we do not discuss this argument further.

The first instruction assured that the jurors had unanimously found Rhino negligent before even addressing gross negligence. The second instruction assured that gross negligence would not be found to have caused 2X2's harm absent unanimity. The court then asked:

> Question No. 12: Do you find by clear and convincing evidence that the harm to 2X2 resulted from gross negligence of Rhino?

The jurors answered: "Yes."

Liability: Fraud

> Similarly, the trial court prefaced its ultimate fraud question with instructions:

> [1]　Answer Question No. 13 only if you unanimously answered "Yes" to. Question No. 9. Otherwise, do not answer the following question.

> [2]　To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon vote of ten or more jurors. Otherwise, you must not answer the following question.

Again, the first instruction assured a unanimous finding that Rhino had indeed committed fraud. And the second instruction assured that fraud would not be found to have caused 2X2's harm absent unanimity. The court asked:

> Question No. 13: Do you find by clear and convincing evidence that the harm to 2X2 resulted from fraud?

The jurors again answered: "Yes."

Amount of Damages:

> This ultimate question was prefaced with the following instruction:

> You are instructed that you must unanimously agree on the amount of any award of exemplary damages.

The court then asked:

Question No. 14:  What sum of money, if any, should be assessed against Rhino and awarded to 2X2 as exemplary damages for the conduct found in response to Question 12 or Question 13?

The jury answered:  "$750,000."

Jurors' Certificates

At the end of the court's initial charge, jurors were required to certify as to their agreement on the verdict. Under the heading **Verdict Certificate**, the jurors checked this statement:

Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

Eleven jurors then signed and printed their names.

The eleven jurors' names were followed by this second certificate:

If you have answered "Yes" to either Question No. 12 or Question No. 13, then you must sign this certificate also.

### Additional Certificate

I certify that the jury was unanimous in answering the following questions marked "yes" below. All twelve of us agreed to each of the answers marked "yes." The presiding juror has signed the certificate for all twelve of us.

Answer "Yes" or "No" for each of the following:

Question No. 12 ___

Question No. 13 ___

The Presiding Juror answered "Yes" in each blank and then signed and printed her name.

Finally, after the jury had awarded exemplary damages, the charge required the following certificate to be signed:

> If you have answered Question No. 14, then you must sign this certificate also.

> **Additional Certificate**

> I certify that the jury was unanimous in answering the following question. All twelve of us agreed to the answer to the following question. The presiding juror has signed the certificate for all twelve of us.

> Question No. 14

The Presiding Juror then signed and printed her name.

### *Determining Unanimity*

Jurors certified that eleven were unanimous on all questions; we must conclude they were not unanimous on all questions, or they would have responded to a different certification. However, we know they were unanimous on Questions No. 12 and No. 13 from their separate certification. And those questions, in turn, required unanimity on a set of underlying tort-liability questions: Questions No. 1 or 5 (finding negligence), and Question No. 9 (finding fraud).

Rhino relies on two cases from this Court that rejected liability for exemplary damages based on a lack of juror unanimity. In *Trish Deatley v. Rodriguez*, 246 S.W.3d 848, 849 (Tex. App.—Dallas 2008, no pet.), it was undisputed that only five of six jurors signed the verdict finding the defendant had maliciously converted the plaintiffs' personal property, the underlying liability that might support exemplary

damages. The trial court went on to hear evidence on exemplary damages, and the jury unanimously voted to award $10,000 to plaintiffs in exemplary damages. *Id.* However, after hearing the defendant's motion for new trial, the trial court deleted that award. *Id.* On appeal, we affirmed the deletion, concluding that "the non-unanimous verdict as to liability is insufficient as a matter of law to support an award of exemplary damages." *Id.* at 850.

Rhino also relies on our opinion in *Kia Motors Corp. v. Ruiz*, 348 S.W.3d 465 (Tex. App.—Dallas 2011), *rev'd on other grounds*, 432 S.W.3d 865 (Tex. 2014). In that case, jurors answered the gross negligence question affirmatively although their certificate and polling established that the jurors had voted eleven-to-one in finding Kia negligent. *Id.* at 490. Because that underlying liability finding was not unanimous, the trial court refused to include the $2.5 million exemplary damage award the jury had made in its judgment against Kia. *Id.* at 491. We affirmed the trial court, concluding that "[r]equiring the jury to unanimously 'find liability for' exemplary damages necessarily includes a finding on the underlying theory of liability." *Id.* at 492.

In both of these cases, the record was undisputed; jurors were not unanimous in finding the liability necessary to award exemplary damages. The record in this case, however, is not so clear. We know that the jurors were not unanimous in every one of their responses. However, we have a specific certification that they were unanimous on the ultimate exemplary-damages questions. In this procedural posture

–24–

we look to our opinion in *Stover v. ADM Milling Co.*, No. 05-17-00778-CV, 2018 WL 6818561 (Tex. App.—Dallas Dec. 28, 2018, pet. denied) (mem. op.). The jurors' certificates in that case mirror those in the case before us: jurors certified that eleven of their number had agreed as to each question, but their additional certificate asserted that all twelve of them agreed on the ultimate exemplary-damages question. *Id.* at \*12. And, as in this case, the exemplary-damages question was prefaced by instructions telling jurors only to answer if they had responded unanimously to the underlying liability question. *Id.* In *Stover*, we relied on the principle that "[t]he jury is presumed to have followed the trial court's instructions," and we concluded the evidence was sufficient to support the exemplary damages award. *Id.* (citing *Columbia Rio Grande Healthcare L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009)). Similarly, in this case, the jury was instructed not to answer Questions No. 12 or No. 13 if they had not voted unanimously on the predicate findings of fraud and at least one theory of negligence. We do not have a record establishing that the jury did *not* follow those instructions, as we did in *Trish Deatley* and *Kia Motors Corp.* Accordingly, we presume that jurors did follow the instructions only to answer Questions No. 12 and No. 13 if they had been unanimous as to underlying tort liability. *See id.*

We conclude the trial court did not err in awarding the exemplary damages found by the jury in this case. We overrule Rhino's fifth issue.

–25–

<h1 style="text-align:center">III.<br>2X2'S CROSS-APPEAL</h1>

Appellee 2X2 cross-appeals the trial court's summary judgment in Rhino's favor on 2X2's claim under the DTPA. Prior to trial, Rhino filed its motion for summary judgment (the Motion) seeking judgment as a matter of law on 2X2's DTPA claim.[6] Rhino urged three grounds for its motion: (1) 2X2's claim was barred by the statute's $500,000 exemption; (2) Rhino's "vague expressions of approval" were not specific enough to constitute fraudulent business practices under the DTPA; and (3) 2X2 failed to give sufficient notice of its claim, so treble damages were not available. The trial court's summary judgment order stated that "Defendant's Motion as to Plaintiff's DTPA cause of action is herein granted." 2X2 contends on appeal that it raised a fact issue on each of its three grounds. We conclude that the first of the three grounds is dispositive of the cross-appeal.

*The DTPA's Large-Project Exemption*

The DTPA includes an exemption for claims growing out of certain large transactions or projects. It provides that:

> Nothing in this subchapter shall apply to a cause of action arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000, other than a cause of action involving a consumer's residence.

---

[6] Rhino's motion also sought summary judgment on 2X2's fraud, negligent misrepresentation, negligence, and gross negligence claims, but all of those grounds were denied.

BUS. & COM. § 17.49(g). The purpose of the exemption is to preserve the DTPA "as a viable source of relief for consumers in small transactions and to remove litigation between businesses over large transactions from the scope of the DTPA." *E. Hill Marine, Inc. v. Rinker Boat Co.*, 229 S.W.3d 813, 820 (Tex. App.—Fort Worth 2007, pet. denied).

*Rhino's Motion*

While Rhino's Motion made reference to a number of declarations and depositions in the case, it relied primarily on 2X2's July 29, 2016 Purchase Order. Rhino argued that the Purchase Order, on its face, demonstrated that the DTPA's $500,000 exemption applied here. The Purchase Order documented 2X2's agreement to pay a total of $507,050 for seven categories of work by Mastersson— six to be performed on 2X2's roof, plus 2X2's share of the cost of the Warranty. Rhino argued those tasks were clearly part of a single project because "[t]hey relate to the same building, they share the same start date, they are listed on the same page, and they were all provided [to 2X2] in the same single quote by Bill Potter." And as to the threshold limitation of $500,000, the Motion argued that the exemption applied to a consumer's "overall" or total consideration, regardless of whether that consideration is broken up into multiple transactions and that the exemption applied to the total consideration paid by the consumer, not just the specific amount in dispute.

2X2 pleaded that "the cost for the purchase and application of this roofing system was slightly less than $500,000." Beginning with its Fourth Amended Petition, 2X2 contended that two categories of work listed on the Purchase Order— the gutter-and-downspout system and the skylights—should not be included in this analysis because these were "separate transactions" in which "Rhino was not involved."

The trial court granted Rhino's Motion.

### *The Cross-Appeal*

2X2 raises the trial court's grant of the Motion as its single issue on cross-appeal. We review the grant of a traditional motion for summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). It is the movant's burden to demonstrate that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c).

It is undisputed that the Purchase Order set forth the terms of the agreement between 2X2 and Mastersson. It is likewise undisputed that 2X2 paid Mastersson at least $507,050 as the Purchase Order required. Accordingly, if the Purchase Order set forth the terms of "a transaction, a project, or a set of transactions relating to the same project," then 2X2's DTPA claim is barred. *See* BUS. & COM. § 17.49(g).

The term "project" is not defined by the DTPA. When the statute does not define a key term, we apply the term's common, ordinary meaning. *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28,

34–35 (Tex. 2017). We determine that meaning by looking first to its dictionary definition and then considering its usage in other statutes, court decisions, and similar authorities. *Id.* In this instance, the dictionary and court opinions agree that a project is a planned undertaking. *See project*, Merriam-Webster Dictionary Online (defining "project" as "a specific plan or design" or "a planned undertaking"); *see also McCoy v. Valvoline, LLC*, 568 F. Supp. 3d 666, 676 (N.D. Tex. 2021) ("a 'project' under § 17.49(g) is properly defined as a 'planned undertaking'" (quoting *SPRAJ Props. LLC v. Regions Bank*, No. 3:13-CV-3472-N, 2015 WL 11120528, at *7 (N.D. Tex. May 12, 2015)). We conclude that the planned undertaking, or project, in this case was the renovation of 2X2's leaking roof.

2X2 asks us to separate out the transactions that involved products not sold by Rhino when we value the project. It is true that the Purchase Order contemplates a series of transactions, some directly involving Rhino's products and some involving products manufactured and sold by other entities. But these transactions are not unrelated. On the contrary, together they represent a single project: the renovation of 2X2's roof. The project was outlined in this single agreement between 2X2 and Mastersson. It had a single start date. It required a single payment. And importantly, the payment cited did not include a direct payment to the suppliers for any of the products identified. Indeed, the installation of those products—not any of the products themselves—has been deemed responsible for the failure of the renovation project. We conclude that the Purchase Order defined a series of related

transactions that together made up the single project of renovating the 2X2 roof. Because 2X2 paid a total consideration of $507,050 for that project, its DTPA claim is barred as a matter of law. *See* BUS. & COM. § 17.49(g); *see also E. Hill Marine, Inc.*, 229 S.W.3d at 821 (sets of related transactions valued collectively under DTPA) (citing *Citizens Nat'l Bank v. Allen Rae Invs., Inc.,* 142 S.W.3d 459, 473 (Tex. App.—Fort Worth 2004, no pet.)).

The trial court did not err in granting Rhino's Motion. We overrule 2X2's single cross-issue.

**IV.**
**CONCLUSION**

We affirm the trial court's judgment.

220522f.p05

/Bill Pedersen, III//
BILL PEDERSEN, III
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

RHINO LININGS CORPORATION,
Appellant

No. 05-22-00522-CV      V.

2X2 PARTNERSHIP, LTD.,
Appellee

On Appeal from the 44th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-18-13009.
Opinion delivered by Justice
Pedersen, III. Justices Molberg and
Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee 2X2 PARTNERSHIP, LTD. recover its costs of this appeal from appellant RHINO LININGS CORPORATION.

Judgment entered this 1st day of March, 2024.